In re Gerald J. MARTIN and Marilyn J. Martin, Individually and as husband and wife, Debtors.

WILMINGTON TRUST COMPANY, Plaintiff,

v.

Gerald J. MARTIN, Marilyn J. Martin, Defendants.

Bankruptcy No. 80–00615G.

Adversary No. 80–0553G.

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 3, 1984.

Bruce D. Shuter, Drinker Biddle & Reath, Philadelphia, Pa., for plaintiff, Wilmington Trust Co.

Horace A. Stern, Wexler, Weisman, Forman & Shapiro, Philadelphia, Pa., for debtors/defendants, Gerald J. Martin and Marilyn J. Martin.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The Wilmington Trust Company ("the bank") has filed a complaint under 11 U.S.C. § 523(a)(2)(A) and (a)(4) of the Bankruptcy Code ("the Code") seeking a determination of the nondischargeability of a debt owed to it by the debtors. For the reasons stated herein we find the debt nondischargeable.

The facts of the case are as follows: [1] For the purpose of purchasing and renovating

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 (effective August 1, 1983).

an apartment building in the State of Delaware, Gerald and Marilyn Martin ("the debtors") borrowed $85,000.00 from the bank in April of 1979 and in exchange granted it a purchase money mortgage. At or about that time the debtors opened a checking account at the bank. In November of that year the bank granted the debtors' request for an increase in the indebtedness to $150,000.00 to facilitate the renovation of the structure. The first $85,000.00 of the new loan was used to satisfy in full the earlier one. The loan documents provided that the bank would deposit portions of the remainder of the loan in the debtors' checking account upon the submission of invoices outlining the costs of material and labor which had been provided. In November and December of 1979 and January of 1980 the husband-debtor intentionally submitted false invoices to the bank in the amounts of $30,835.69, $24,149.00 and $3,100.00 respectively. The bank deposited funds in the debtors' checking account in an amount equal to the sum of the first two invoices but requested further documentation on all the invoices prior to payment on the third one. The debtors were able to provide substantiation of only a small portion of the face amount of the invoices. The bank's failure to forward funds on the third invoice was apparently due to its examination of the construction site which apparently occurred between the submission of the second and third invoices, which disclosed that only 20% of the work on the building had been completed rather than the 50 or 60% which the bank had anticipated in light of the amount of funds advanced. In the end of 1979 the husband-debtor withdrew $37,500.00 from the checking account for investment in a questionable scheme by which he hoped to double his money in thirty days. Upon realizing that he had been defrauded, he informed the bank, and the loan was "shut down" apparently in January of 1980.

After the execution of the documents for the $150,000.00 loan the bank advanced the following funds, some of which were previously outlined above: $85,000.00 in satisfaction of the original loan; $30,385.69 and $24,149.00, based on the invoices; $1,175.00 for an insurance payment on the property made on February 25, 1980; $4.00, an unidentified deposit in the checking account; and $573.19, a deposit on March 28, 1980, to cover an overdraft in the checking account. These advances total $141,286.88. During this period the debtors also deposited $14,500.00 in the account, part of which covered an overdraft of $649.39 which existed when the $150,000.00 loan was made.

During this interval both debtors wrote a total of 55 checks totalling $68,000.00. The debtors concede that all but eight of the checks, for a total of $10,389.09, were unrelated to the expenses of renovating the building, although the bank disputes these eight. We find the eight checks were written for legitimate business expenses except for $1,513.00 of the $6,000.00 expenditures for labor.[2] Thus the bona fide expenses paid through the checking account total only $8,876.09.

The debtors filed a petition for reorganization under chapter 11 of the Code on March 25, 1980. Shortly thereafter the bank filed the complaint at issue requesting relief from the automatic stay imposed by 11 U.S.C. § 362(a) and seeking a determination of the nondischargeability of its debt. Ultimately the parties agreed to a modification of the stay, thus allowing the bank to commence foreclosure proceeding against the mortgage on the subject property. A judgment was entered in favor of the bank for $154,296.70 which was the sum of the underlying debt plus interest, attorneys'

---

2. The sums in dispute are as follows: check # 241, 11/21/79, Martins' Laundry and Dry Cleaning, $1,000.00; check # 242, 11/21/79, Martins' Laundry and Dry Cleaning (payroll), $2,000.00; check # 255, 12/4/79, G.J. Martin Company (payroll), $3,000.00; check # 266, 12/10/79, Wilmington Saving Fund Society (payment of commitment fee), $3,000.00; check # 275, 12/31/79, The Wood Shop (lumber), $352.55; check # 290, 12/15/79, Delmarva Light and Power (electricity), $68.55; check # 289, 12/18/79, Burns and McBride (oil burner), $918.99; and check # 299, 12/21/79, Artisans Savings Bank (damages to adjacent property), $49.00.

fees and the cost of certification of the mortgage. A sheriff's sale of the property generated $60,000.00 which is our determination of the fair market value of the property.

The bank contends that the debt is not dischargeable under: (1) 11 U.S.C. § 523(a)(4), since the construction documents create a technical trust which would make the debtors fiduciaries; (2) § 523(a)(4), since Del.Code Ann. tit. 6, §§ 3501 to 3505, provide that contractors receiving funds under a construction contract hold those funds in trust and thus would be fiduciaries of the dissipated money; and (3) § 523(a)(2)(A), since the debtors obtained part of the funds under false pretenses, false representations or actual fraud.

■■■ Section 523(a) provides in part as follows:

§ 523   Exceptions to discharge

(a) A discharge under section 727, 1141, or 1328(b) does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;  or

(B) * * *

*     *     *     *     *     *

(4) for fraud, or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

*     *     *     *     *     *

Under § 523(a)(4) and its predecessor, § 17a[3] of the Bankruptcy Act of 1898, debts arising from a fiduciary's fraud or defalcation are not dischargeable. When the debtor's fiduciary capacity is based on his status as a trustee of a trust, the trust must have existed prior to the wrongdoing from which the debt arose. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). Thus, an exception to discharge cannot be based

upon a constructive or implied trust. *Angelle v. Reed,* 610 F.2d 1335, 1339 (5th Cir. 1980); *National Bank of Detroit v. Olson (In Re Olson),* 9 B.R. 52, 55 (Bkrtcy.E.D. Wis.1981); *Hall v. Cooper (In Re Cooper),* 30 B.R. 484, 489 (Bkrtcy. 9th Cir.1982). The creditor can prevail only if his proof establishes the existence of the elements of a formal trust or shows that it has the typical attributes of such a trust. *Ford Motor Credit Co. v. Talcott (In Re Talcott),* 29 B.R. 874, 878 (Bkrtcy.D.Kan.1983). As stated in *Schlecht v. Thornton,* 544 F.2d 1005, 1007 (9th Cir.1976), "The general characteristics of an express trust are 1) sufficient words to create a trust; 2) a definite subject; and 3) a certain and ascertained object or res. 89 C.J.S. Trusts § 22, pp. 734–35. The intent to create a trust relationship rather than a contractual relationship is the key element in determining the existence of an express trust." The mere presence of the term "trust" in a loan contract is generally insufficient, in and of itself, to create a trust and transform the relationship between the parties from that of a debtor and creditor to that of a trustee and beneficiary. As held by the U.S. Supreme Court, "The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust." *Davis,* 293 U.S. at 334, 55 S.Ct. at 154. In the case at bench the bank relies on statements in the loan contract which provided that the debtors would "receive the instalments secured by said mortgage as a trust fund to be applied solely for the purpose of paying the cost of said improvements" and that the funds disbursed by the bank would be deposited in the debtors' checking account solely for the purpose of renovating the apartment building. The bank also contends that certain covenants in the contract, such as the debtors' promise to renovate the building, support the existence of a trust. Under the authority of *Davis, supra,* we find that there was no intent to create a trust and no *res.* 293 U.S. at 334, 55 S.Ct. at 154. Although most

**3.** Section 17a provided in part that: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity."

of the funds disbursed by the bank on the loan were deposited in the debtors' checking account certain other portions of the res never were, e.g., the $1,175.00 insurance payment was made by the bank directly to the insurance company. Furthermore, there seems to have been no restriction on the debtors' deposit of funds in the account and, in fact, the debtors deposited $14,500.00 after the execution of the contract for the $150,000.00 loan, apparently so they could draw on the account up to the limit of their deposits in order to meet their personal expenses. This comingling of "trust funds" with the debtors' money, which was apparently allowable under the contract,

weighs heavily against both the existence of an identifiable trust res and the necessary intent to create a trust. Consequently, the loan documents did not create a trust and the bank's debt cannot be excepted from discharge under § 523(a)(4), based on the debtors' status as trustees of the purported trust.

Also under § 523(a)(4) the bank urges that Del.Code Ann. tit. 6, §§ 3501 to 3505, made the debtors fiduciaries under Delaware law at the time they executed the contracts for the $85,000.00 and $150,000.00 loans. The relevant statutory provisions are set forth in the margin.[4]

---

**4.** § 3501. Definitions.

As used in this chapter:

(1) 'Contractor' includes, but is not limited to, an architect, engineer, real estate broker or agent, subcontractor or other person, who enters into any contract with another person for the erection, construction, completion, alteration or repair of any building or for additions to a building, by such contractor, or, for the sale to such other person of any lands and premises, whether owned by such contractor or another, upon which such contractor undertakes to erect, construct, complete, alter or repair any building or addition to a building.

(2) 'Moneys or funds' includes, but is not limited to, the entire amount of all moneys or funds received by a contractor, as defined in this section, who, being the owner of the legal title to lands and premises, receives, in connection with a contract for the sale thereof and for the erection, construction, completion, alteration or repair of any building or addition thereon by such contractor, any moneys or funds by way of a loan or advance upon the security of such lands and premises for the purpose of such erection, construction, completion, alteration or repair, or who receives from the other contracting party or vendee any deposit or sum of money on account of the purchase or contract price, and no part of such moneys or funds shall be deemed or construed applicable to the payment of the cost or selling price of land, unless that part of the contract price or selling price applicable to cost or selling price of land, be specifically so stated in the contract.

§ 3502. Payments to contractor impressed with trust.

All moneys or funds received by a contractor in connection with a contract for the erection, construction, completion, alteration or repair of any building or for additions to a building and all moneys or funds received by a contractor in connection with a contract for the sale of land and the erection, construc-

tion, completion, alteration or repair of any building or addition thereon, shall be trust funds in the hands of the contractor.

§ 3503. Use or application of money received by contractor.

No contractor, or agent of a contractor, shall pay out, use or appropriate any moneys or funds described in § 3502 of this title until they have first been applied to the payment of the full amount of all moneys due and owing by the contractor to all persons (including surveyors and engineers) furnishing labor or material (including fuel) for the erection, construction, completion, alteration or repair of, or for additions to, such building, whether or not the labor or material entered into or became a component part of any such building or addition and whether or not the same were furnished on the credit of such building or addition or on the credit of such contractor.

§ 3504. Contractor's failure to use or apply money in accordance with § 3503.

Failure of a contractor, or of an agent of a contractor, to pay or cause to be paid, in full or pro rata, the lawful claims of all persons, forms, association of persons or corporations (including surveyors and engineers), furnishing labor or material (including fuel), as required by § 3503 of this title, within 30 days after the receipt of any moneys or funds for the purposes of § 3502 of this title, shall be prima facie evidence of the payment, use or appropriation of such trust moneys or funds by the contractor in violation of the provisions of this chapter.

§ 3505. Penalties.

Whoever, being a contractor, or any agent of a contractor, pays out, uses or appropriates, or consents to the paying out, use or appropriation of any moneys or funds received for any of the purposes specified in § 3502 of this title, prior to paying in full or pro rata to the extent of the moneys or funds so received, all the lawful claims of all persons (including surveyors and engineers) fur-

As noted above the literal language of § 523(a)(4), and its predecessor, § 17a(4), indicates that an exception to discharge can be predicated on a debt that arose through fraud or defalcation while the debtor was acting in a fiduciary capacity. The statutory provisions contain no restriction that the debt be associated with the formal legal entity of a trust although equivocal language in the case law may give rise to the notion that such a limitation exists. In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934), the Court stated as follows:

> The respondent contends that irrespective of wilfulness or malice, the petitioner is within the exception declared by [17a(4), predecessor of § 523(a)(4)], his liability arising, it is said, from his fraud or misappropriation while acting in a fiduciary capacity. The meaning of these words has been fixed by judicial construction for very nearly a century. *Chapman v. Forsyth*, 2 How. 202 [11 L.Ed. 236], decided in 1844, is a decision to the effect that within the meaning of a like provision in the Act of 1841, a factor does not act in a fiduciary capacity; the statute "speaks of technical trusts, and not those which the law implies from the contract." 2 How. at p. 208. The scope of the exception was to be limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. *Neal v. Clark*, 95 U.S. 704, [24 L.Ed. 586]; *Hennequin v. Clews*, 111 U.S. 676, 682 [4 S.Ct. 576, 579, 28 L.Ed.2d 565]; *Noble v. Hammond*, 129 U.S. 65, 68 [9 S.Ct. 235, 236, 32 L.Ed. 621]; *Upshur v. Briscoe*, 138 U.S. 365 [11 S.Ct. 313, 34 L.Ed. 931]; *Crawford v. Burke* [195 U.S. 176], 193 [25 S.Ct. 9, 49 L.Ed. 147], supra; *Tindle v. Birkett*, supra, 205 U.S. 183 [27 S.Ct. 493, 51 L.Ed. 762]; Cf. *Cronan v. Cotting*, 104 Mass. 245; *Clair v. Colmes*, 245 Mass. 281, 139 N.E. 519.

In *Upshur v. Briscoe*, 138 U.S. 365, 375–76, 11 S.Ct. 313, 316–17, 34 L.Ed. 931 (1891), which was cited in *Davis*, the court stated as follows:

> The case of *Chapman v. Forsyth*, 2 How. 202 [11 L.Ed. 236], arose under the bankruptcy act of August 19, 1841, c. 9, 5 Stat. 440, the first section of which provided for the discharge from debts "which shall not have been created in consequence of a defalcation as a public officer, or as executor, administrator, guardian or trustee, or while acting in any other fiduciary capacity." In that case, it was said that the exception applied to the debts and not to the person, if he owed other debts; and that, if the act embraced, as a fiduciary debt, the debt of a factor who retains the money of his principal, it would be difficult to limit its application. The court added: "It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act. The cases enumerated, 'the defalcation of a public officer,' 'executor,' 'administrator,' 'guardian' or 'trustee,' are not cases of implied, but special trusts, and the 'other fiduciary capacity' mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act."

Thus, merely because the creditor has placed some trust or confidence in the debtor, his debt will not be excepted under § 523(a)(4), although it will be so excepted if the debt was incurred in a fiduciary capacity. Under § 523(a)(4) and § 17a(4) "attorneys, bank officers, executors and administrators, guardians, receivers, the presi-

---

nishing labor or materials (including fuel), as prescribed by § 3503 of this title, shall be

fined not more than $1,000 or imprisoned not more than 3 years, or both.

dent of a private corporation entrusted with funds for a particular purpose, and, of course, other technical trustees have been held to be acting in a fiduciary capacity. . . ." 3 *Collier on Bankruptcy* ¶ 523.14, at 523–103 to 523–104 (15th ed. 1982) (footnotes omitted). Although common law fiduciary relationships can be the basis for the exception to discharge of a debt under § 523(a)(4), statutory law can impose fiduciary obligations which likewise bar the discharge of a debt. *E.g., Carlisle Cashway, Inc. v. Johnson,* 691 F.2d 249 (6th Cir.1982) (debt nondischargeable under § 17a(4) where the Michigan Building Contract Fund Act imposed a "trust" upon a building contract fund); *Carey Lumber Co. v. Bell,* 615 F.2d 370 (5th Cir.1980) (debt nondischargeable under § 17a(4) due to fiduciary liability imposed by Oklahoma Lien Trust Statutes which imposed a trust on funds held for renovation and improvements on realty). We find that the Delaware statute at issue in this case is sufficiently similar to those found in *Carlisle Cashway* and *Carey Lumber* and consequently, the statute has vested the debtors with the obligations of fiduciaries. Since both debtors signed the construction loan documents, both are subject to fiduciary obligations.

The debtors urge us to deny relief under § 523(a)(4) and the Delaware statute since the bank failed to plead it properly. A review of the complaint and the amended complaint reveals that the bank did plead a cause of action under § 523(a)(4) asserting that the loan documents created a trust although no reference was made to the Delaware statute. The bank contends that it was not necessary to cite the statute since it merely provides the basis of the relationship between the parties. In effect the bank is asserting that the Delaware statute merely provides a different theory of recovery rather than a different cause of action. The parties agree that the bank's counsel sent the debtors' counsel a letter approximately one and one-half years before trial which outlined in length the Delaware statute. Fed.R.Civ.P. 8(f), which is applicable in this proceeding through Bankruptcy Rule 7008, states, "All pleadings shall be construed as to do substantial justice." In light of the letter issued by the bank and the debtors' failure to urge and specify any basis for prejudice resulting from the inclusion of this theory or cause of action in the case, we construe the matter to be properly pleaded.

The debtors also defend this action by urging that they are not contractors within the meaning of the statute. We find this statement without factual support since the record indicates that the debtors executed contracts with individuals who did the actual renovation of the building.

Lastly, the debtors contend that since "the statute is a criminal statute [it] must be strictly construed." Even applying this maxim of legal construction, we find that the debtors are charged with fiduciary duties under the Delaware statute.

Although the debtors have not expressly so argued, statutes which are solely general criminal statutes are considered by the weight of authority an insufficient basis for imposing fiduciary liabilities under § 523(a)(4). As stated in *Carlisle Cashway,* 691 F.2d at 253, "Those circuits that have dealt with statutes which impose only criminal or other penalties on a general contractor have refused to find a fiduciary relationship within the scope of section 17(a)(4). There the statutory trust arises only upon the act of misappropriation and cannot be said to exist prior to the wrong and without reference to it even though a technical or express trust may exist at that time." The rationale is that through "the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio.* He must have been a trustee before the wrong and without reference thereto." *Davis,* 293 U.S. at 333, 55 S.Ct. at 153. Otherwise, any diversion of funds punishable by a criminal statute would give rise to a nondischargeable debt under § 523(a)(4). This rule does not apply if the defalcation on the debt arose *after* the imposition of fiduciary obligations. In addition, the existence of civil liabilities arising from the statute weighs in favor of using the statute as a predicate for excepting a debt from discharge under

§ 523(a)(4). Under the Delaware statute at issue relief on a civil action was granted to a creditor in the form of the equitable remedy for accounting. *Maull v. Stokes,* 31 Del.Ch. 188, 68 A.2d 200 (1949).

Having determined that the debtors are subject to fiduciary obligations under the Delaware statute, we must establish when these obligations arose for the purpose of determining what portion of the debt is nondischargeable. Since the first loan made by the debtors, which was in the amount of $85,000.00, indicated that the funds would be used for the purchase and renovation of the apartment building, the fiduciary obligations were imposed by the statute at that time. Thus, the funds advanced under this loan as well as under the subsequent one are subject to exception to discharge.

A debt can be found nondischargeable under the portion of § 523(a)(4) at issue here only if the funds were lost through defalcation. "Defalcation includes the failure by a fiduciary to account for money he received in his fiduciary capacity." *Kleppinger v. Kleppinger* (*In Re Kleppinger*), 27 B.R. 530, 532 (Bkrtcy.M.D.Pa. 1982). Under § 523(a)(4) no element of intent or bad faith is necessary before a breach of such fiduciary duties will constitute a misappropriation or defalcation. "No particular mental state is required on the part of the person creating the debt in contrast to those designated in sections 17a(2) and (8) [§ 523(a)(2) and (6)] . . . ." *Carlisle Cashway,* 691 F.2d at 254. Since the debtors have proven that only $8,876.09 of the funds were properly invested in the purchase and renovation of the realty the remainder of the debt, less the $60,000.00 generated by the sheriff's sale, to wit, $85,-420.61 plus interest, is nondischargeable.

The debtors assert that size of the nondischargeable debt should be reduced by the difference between the fair market value of the realty and the price for which the property was sold at sheriff sale. In the absence of the debtors' failure to allege and prove that the sale of the property was conducted in a commercially unreasonable manner, we must afford the $60,000.00 sheriff sale value very substantial weight. The bank proceeded in good faith in selling the property in response to the debtors' default and defalcation. The *estimates* of the value of the property offered at trial pale in the face of the *actual* selling price of the realty at the sheriff's sale. Furthermore, the debtors assert that the proper standard of valuation for the property is fair market value rather than distress sale or sheriff sale value. We also find this contention without merit. As we indicated in *American Bank and Trust Co. of Pa. v. Ram Manufacturing, Inc. (In Re Ram Manufacturing, Inc.),* 32 B.R. 969, 972–73 (Bkrtcy.E.D.Pa.1983), the Code affords the court wide flexibility in adopting a standard of valuation which is suited to the facts of a particular case and the intended disposition of the property. Since the property was in fact sold at a sheriff's sale, a distress sale value seems eminently reasonable. Consequently, the value of the property is the sale price fixed by the sheriff's sale.

In summary, we will enter an order excepting from discharge the debt of Gerald and Marilyn Martin to the bank in the amount of $85,420.61 plus interest. This result makes it unnecessary for us to consider the bank's contentions under § 523(a)(2).