In re Harold E. RAMONAT, Jr., a/k/a George Ramonat, and Mary Louise Ramonat, Debtors.

FIRST VALLEY BANK, Plaintiff,

v.

Harold E. RAMONAT, Jr., a/k/a George Ramonat, and Mary Louise Ramonat, Defendants.

Bankruptcy No. 84–00276 T.
Adv. No. 84–0688.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 3, 1988.

eral was possible, and reflects the view that

Congress did not intend to assume that risk.

Kevin T. Fogerty, Traub & Butz, P.C., Allentown, Pa., for First Valley Bank.

Michael C. Deschler, Bethlehem, Pa., for debtors.

James G. Watt, Allentown, Pa., trustee.

## MEMORANDUM OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Plaintiff, First Valley Bank ("plaintiff"), has filed this complaint to determine the dischargeability of a portion of a debt owed to it by the husband and wife debtors/defendants, Harold and Mary Ramonat ("debtors"). Mixed questions of fact and law abound in plaintiff's allegations that debtors/defendants committed defalcation, embezzlement and willful and malicious injury in violation of 11 U.S.C. §§ 523(a)(2), 523(a)(4) and 523(a)(6).

Based on the facts adduced at trial and the cases cited below, we find that (1) no defalcation in violation of 11 U.S.C. § 523(a)(4) occurred because the requisite fiduciary relationship did not exist; (2) no embezzlement in violation of 11 U.S.C. § 523(a)(4) occurred because the necessary entrustment of funds was not present, and (3) debtors committed willful and malicious injury in violation of § 523(a)(6). This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Debtors owned all of the common shares of a Pennsylvania corporation known as Tanomar, Inc., trading as Tom Bass–Tiger Hall ("Tanomar"). Plaintiff is a banking corporation. In March of 1982, Tanomar was obligated to First National Bank of Allentown ("FNBA") on two business loans: a $175,000.00 line of credit and a five year term loan. Notes of Testimony, September 4, 1985 ("N.T."), at 23. FNBA collateralized these loans with liens against Tanomar's assets and debtors' real estate:

DEBTORS' REAL ESTATE

| | | |
|---|---|---|
| 512–514 Main Street | 1st position: ("Union Bank") | Union Bank of Bethlehem mortgage |
| | 2nd position: | FNBA judgment lien |
| 516–518 Main Street | 1st position: | Union Bank |
| | 2nd position: | FNBA judgment lien |
| 20 W. Church Street | 1st position: | Union Bank |
| | 2nd position: | FNBA judgment lien |

TANOMAR'S ASSETS

| | | |
|---|---|---|
| Inventory, Machinery, Equipment, Furniture and Fixtures | 1st position: | FNBA |

N.T. at 31, 32, 37, 39; complaint, para. 11 and answer, para. 11.

Debtors decided to refinance. N.T. at 23, 57. The loan package negotiated by debtor-husband, in his capacity as a corporate officer, involved a pari passu relationship between two lenders, plaintiff and Marine Midland Bank ("MMB").[1] N.T. at 21, 3. Plaintiff was to provide a loan of $170,000.00.

On June 1, 1982, plaintiff issued a commitment letter ("commitment letter").[2] The commitment letter provided that the

1. Marine Midland Bank, N.A., Buffalo, New York, administered a family trust, the Cowper/Frame trust.

2. Debtors assert that the parol evidence rule bars use of the commitment letter as evidence of (1) the use of the loan proceeds; (2) understandings and conditions regarding use of the loan money, and (3) the intention of the parties regarding use of the loan money. *See* answer, paras. 9, 10, and 12. They did not raise their parol evidence objections at trial. Plaintiff,

loan would be secured by (1) a *first* lien on all inventory, machinery, equipment, furniture and fixtures of Tanomar; (2) the personal guarantee of debtors, and (3) *second* mortgage liens on the properties located at 20 West Church Street and 512–514 Main Street. N.T. at Plaintiff's Ex. # 1. The commitment letter also provided that the loan was "... subject to Mr. and Mrs. Harold E. Ramonat obtaining an interest free loan of not less than $75,000.00 from the Cowper/Frame Trust, administered by Marine Midland Bank, N.A., Buffalo, New York ..." N.T. at Plaintiff's Ex. # 1.

A two step settlement was held, apparently due to delay in receipt of the MMB loan check. Plaintiff gave debtors its $170,000.00 check payable to Tanomar. That money was transmitted to FNBA, paying off a *portion* of Tanomar's debt to FNBA. The settlement sheet was not signed because the MMB check had not yet been received. N.T. at 14.

The MMB check was received by debtor-wife, an officer of Tanomar, who put this money into the Tanomar business account at plaintiff banking institution. N.T. at 28. A portion of this money was retained as working capital and a portion used to pay suppliers. N.T. at 28, 29.

In November of 1982, a committee was formed to assist and guide Tanomar's operations, with an eye toward maximizing sales. Finally, at the end of March, 1983, it was decided· to liquidate the business. N.T. at 51. As part of this sequence of events, in April, 1983, debtors sold the Church street property which they owned in their individual capacities.

Ascertaining the existence of a fiduciary relationship is the threshold issue in determining whether defalcation in contravention of § 523(a)(4) occurred. *Greyhound Lines, Inc. v. Fains, (In re Fains)*, 37 B.R. 539, 541 (Bankr.E.D.Pa.1984). Section 523(a)(4) states that a discharge will not include any debt "... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; ..." 11 U.S.C. § 523(a)(4). Plaintiff bears the burden of proof in establishing a fiduciary relationship. *In re Hammill*, 61 B.R. 555, 556 (Bankr.E.D.Pa.1986); *In re Mullins*, 64 B.R. 287, 289 (Bankr.W.D.Va.1986); *Volk of Philadelphia, Inc. v. Gelfand (In re Gelfand)*, 47 B.R. 876, 879 (Bankr.E.D.Pa. 1985); *Brennenstuhl v. Taylor (In re Taylor)*, 49 B.R. 849, 851 (Bankr.E.D.Pa.1985). Exceptions to discharge are construed against creditors and in favor of debtors. *In re Gelfand*, 47 B.R. 876, 879; *Citizens & Northern Bank v. Phillips (In re Phillips)*, 27 B.R. 646, 647 (Bankr.M.D.Pa. 1982).

No precedent exists in this circuit on the question of whether a corporate officer, handling this type of loan money, acts as a § 523(a)(4) fiduciary. Analysis from other circuits is not binding, but will be persuasive in this context-bound area of the law.

Plaintiff relies on one line of cases [3] discussing the conditions under which corporate officers can be construed to have acted as fiduciaries. *See e.g., Bellity v. Wolfington (In re Wolfington)*, 48 B.R. 920 (Bankr.E.D.Pa.1985); *Drinker Biddle & Reath v. Bacher (In re Bacher)*, 47 B.R. 825 (Bankr.E.D.Pa.1985); *American Met-*

however, briefed the issue. It appears that debtors may have abandoned their parol evidence objections, although we are not called upon to decide this issue at present. *See e.g., Pellegrene v. Luther*, 403 Pa. 212, 169 A.2d 298 (1961); *Bell v. Yellow Cab. Co.*, 399 Pa. 332, 160 A.2d 437 (1960); *Keefer v. Byers*, 398 Pa. 447, 159 A.2d 477 (1960). *Cf. Pitcairn v. Philip Hiss Co.*, 125 F. 110 (3d Cir.1903). *See generally, Annotation, Modern Status of Rules Governing Legal Effect of Failure to Object to Admission of Extrinsic Evidence Violative of Parol Evidence Rule*, 81 A.L.R. 249 (1933); *Annotation, Legal Effect of Parol Evidence Inadmissible Under Parol Evidence Rule but Admitted without Objection*, 82 A.L.R. 810, 811 (1934). At least one court has held that a parol evidence objection was waived when the issue was raised in a brief but the objection was not interposed when the testimony and exhibits were offered. *Massey–Ferguson Credit Corp. v. Brown*, 169 Mont. 396, 547 P.2d 846 (1976).

**3.** This line of cases can be traced back to § 17(a)(4) of the former Bankruptcy Act, 11 U.S.C. § 35(a)(4) which excepted from discharge "... debts created by fraud ... or defalcation of the debtor while acting as an officer or in any fiduciary capacity ..."

*als Corp. v. Cowley (In re Cowley)*, 35 B.R. 526 (Bankr.D.Kan.1983); *United Virginia Bank v. Fussell (In re Fussell)*, 15 B.R. 1016, 1021 (W.D.Va.1981). Debtors focus on a second line of analysis which emphasizes that the requisite fiduciary relationship cannot exist absent an express trust. *See e.g., In re Nova Real Estate Investment Trust*, 23 B.R. 62, 7 C.B.C.2d 87 (Bankr.E.D.Va.1982). The express trust and corporate officer lines of cases are not mutually exclusive and can be harmonized.

 In this district, we have ruled that the existence of an express trust, not merely an implied or constructive trust, is a prerequisite to a finding of § 523 defalcation. *In re Bacher*, 47 B.R. 825, 829. *See also In re Wolfington*, 48 B.R. 920, 923. The elements of an express trust have been identified as (1) words necessary to create a trust; (2) a definite subject, and (3) a trust res. *Wilmington Trust Co. v. Martin (In re Martin)*, 35 B.R. 982, 985 (Bankr.E.D.Pa.1984), *citing Schlecht v. Thornton*, 544 F.2d 1005, 1007 (9th Cir. 1976).

The trust may flow from consensual agreements between the parties if the parties intended to create a trust rather than a contractual relationship. *Wilmington v. Martin*, 35 B.R. 982, 985. The wording of a relevant statute may also create a technical express trust. *Doucette v. Kwiat (In re Kwiat)*, 62 B.R. 818, 820 (Bankr.D.Mass. 1986) (Disciplinary Rules), *citing Purcell v. Janikowski (In re Janikowski)*, 60 B.R. 784 (N.D.Ill, 1986). *See e.g., Home Ins. Co. v. McCormick (In re McCormick)*, 70 B.R. 49 (Bankr.W.D.Pa.1987) (insurance agents); *National Bonding & Accident Ins. Co. v. Petersen (In re Petersen)*, 51 B.R. 486 (Bankr.D.Kan.1986) (Packers & Stockyards Act); *American Ins. Co. v. Lucas (In re Lucas)*, 21 B.R. 585 (Bankr.W.D.Pa.1982) *affd.*, 41 B.R. 923, Bankr.L.Dec. para. 69,-

972 (W.D.Pa.1984) (statute governing issuing agents for state fishing licenses); *Wilmington v. Martin*, 35 B.R. 982 (statute governing contractors). The statute must impose a trust on the subject property and set forth specific fiduciary duties. *In re Janikowski*, 60 B.R. 784, 788, *citing In re Johnson*, 691 F.2d 249, 253 (6th Cir.1982).

Courts scrutinize these statutes to determine to whom the benefits of the trust run. As the *Cowley* court noted, "... it has long been settled that a corporate officer is a 'fiduciary' of the corporation ..." *In re Cowley*, 35 B.R. 526, 529, *citing Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 141, 79 L.Ed. 393 (1934). But "... a corporate officer may not be a fiduciary of the corporation's creditors absent a statutory, technical or express trust." *In re Cowley*, 35 B.R. 526, 529 & n. 1.

Plaintiff's heavy reliance in *Wolfington* is misplaced. In *Wolfington*, plaintiff/purchasers had deposited money in an escrow account pursuant to a statute creating a specific trust res. *In re Wolfington*, 48 B.R. 920, 925. The statutory trust was a significant factor[4] in the decision: "The debtor's position as president, director and fifty percent (50%) shareholder of the corporation ... plus the fact that he held himself out to be a real estate agent/broker, establish the requisite fiduciary relationship ..." *Id.* at 923. The opinion explicitly stated that "(m)ore than a misappropriation of corporate funds was involved here. *The misappropriated funds were, in fact, trust funds ...*" *Id.* at 925 (emphasis added).

 Applying the criteria outlined above, we find that no trust existed in the instant case. None of the underlying documents purports to create a trust, no relevant statute[5] exists, and no specific trust res can be

---

**4.** Plaintiff fails to point out that these trust-like elements in *Wolfington* influenced the decision. Indeed, at least one other court has cited *Wolfington* for the proposition that an express trust must underlie the § 523(a)(4) relationship. *See Klingman v. Levinson (In re Levinson)*, 58 B.R. 831, 836 (Bankr.N.D.Ill.1986).

**5.** Neither of the parties has argued that any express statutory authority creates a trust for the purpose of establishing a § 523(a)(4) fiduciary relationship. Our review has uncovered one statutory provision regarding the liability of corporate directors, *see* 42 Pa.C.S.A. § 8363 (Supp.1987), but that statute would fail the *Janikowski* review because it does not create a specific trust res. We feel compelled to note a

identified. Nothing in these documents suggests that this is more than a debtor/creditor relationship. Further, the loan documents did not prohibit debtors from commingling the loan money with other funds; the loan money was placed in a Tanomar business account maintained at plaintiff banking institution. We agree that this ability to commingle funds "... weighs heavily against both the existence of an identifiable trust res and the necessary intent to create a trust." *Wilmington v. Martin*, 35 B.R. 982, 986.[6]

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." 3 *Collier on Bankruptcy*, para. 523.14[3], p. 523–107 (15th ed. 1983), *cited in In re Fains*, 37 B.R. 539, 543. *See also Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895). Black's Law Dictionary has defined "entrust," a term that figures prominently in all case law definitions of "embezzlement":

> To give over to another something after a relation of confidence has been established. To deliver to another something in trust or to commit something to another with a certain confidence regarding his care, use or disposal of it.

*Black's Law Dictionary* 478 (5th ed. 1979).

■ Plaintiff must meet its heavy burden in proving § 523(a)(4) embezzlement with clear and convincing evidence. *Commonwealth of Virginia Comm'n of Game and Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 905 (Bankr.E.D.Va.

1985); *Great American Ins. Co. v. Storms (In re Storms)*, 28 B.R. 761, 765 (Bankr.E.D.N.C.1983); *Great American Ins. Co. v. Graziano*, 35 B.R. 589, 593 (Bankr.E.D.N.Y.1983). Circumstantial evidence, however, can be used to prove misappropriation and fraudulent intent. *Chrysler Credit Corp. v. Rebhan (In re Rebhan)*, 45 B.R. 609, 614 (Bankr.S.D.Fla.1985); *Bailey v. James (In re James)*, 42 B.R. 265, 267 (Bankr.W.D.Ky.1984).

■ The parties agree that the mere existence of a debtor/creditor relationship cannot be a basis for finding that embezzlement occurred; the money belongs to the debtor in such a relationship and use of the money does not amount to embezzlement. *See e.g., In re Storms*, 28 B.R. 761, 765; *In re Myers*, 52 B.R. 901, 905. At the other end of the spectrum, it is unnecessary to prove the existence of a fiduciary relationship to prove embezzlement. *Funventures in Travel, Inc. v. Dunn*, 39 B.R. 249, 251 (E.D.Pa.1984). Buried in these cases is the question of what intermediate level of relationship is sufficient to establish § 523(a)(4) embezzlement.[7] No clear answer has emerged.

■ We find that the instant transaction is one step removed from the typical entrustment scenario. Plaintiff is not objecting to the disposition of the $170,000.00 that it loaned, but rather to the use of the $75,000.00 loaned by MMB. We have found no cases on point. All of the cases cited by plaintiff discuss a defendant's obligations to a creditor to use money loaned by that creditor in a particular fashion.[8]

---

prior decision of this court indicating that a corporate officer stands in a fiduciary relationship to the corporation, its shareholders and creditors. *Goldberger v. Bross (In re Complete Drywall Contracting, Inc.)*, 11 B.R. 697 (Bankr. E.D.Pa.1981). The statute referred to in *Complete Drywall* has been replaced by 42 Pa.C.S.A. § 8363, *see* 15 Pa.S.A. § 1408, which does not meet the *Janikowski* test.

6. In *Martin*, Judge Goldhaber found that the loan agreement did not create a formal relationship. *Wilmington Trust Co. v. Martin*, 35 B.R. 982, 986. However, the court did find the existence of a fiduciary relationship that had been created by a pertinent state contractor's statute.

*Id.* at 989. That statute, of course, does not govern the instant matter.

7. The necessary relationship has been described as "... some form of trust by virtue of a debtor holding funds for another ..." *In re Myers*, 52 B.R. 901, 905.

8. The cases cited by plaintiff can be distinguished in important respects from the instant case. *See e.g., In re James* 42 B.R. 265, 268 & n. 14 (not a loan transaction between a borrower and a lender because plaintiff and debtor were joint venturers); *National Bank of Amarillo v. Martin (In re Martin)*, 25 B.R. 25, *remanded* (on other issues), 48 B.R. 317 (Bankr.N.D.Tex.1985)

None of these cases state that a debtor has an obligation to one lender to use funds obtained from another lender in a particular fashion. The commitment letter may create an obligation to provide certain lien positions to plaintiff, but it does not create a relationship in which debtors are entrusted with MMB's funds to use for the benefit of plaintiff. Plaintiff may have entrusted loan money to debtor, but the issue here is not the disposition of plaintiff's loan money.

Independently of the § 523(a)(4) objections, plaintiff argues that this debt should not be discharged because it is a debt "... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The term "willful and malicious injury" covers a willful and malicious conversion. *In re Behr*, 42 B.R. 922, 925; *Finberg v. Lean (In re Lean)*, 18 B.R. 189, 191 (Bankr.E.D.Pa.1982). We have defined "conversion" as "... any unauthorized act which deprives an owner of his property permanently or for an indefinite time." *In re Behr*, 42 B.R. 922, 925.

▇▇▇ A creditor suffers a § 523(a)(6) injury if it is precluded from maintaining its rights in collateral. *See e.g., In re Smith*, 11 B.R. 20, 23 (Bankr.N.D.Ohio 1981) (quoted approvingly by our court in *In re Allavena*, 31 B.R. 73, 75–76 (Bankr. E.D.Pa.1983).) There is no question that the instant plaintiff was injured because it lost the benefit of particular lien positions on its collateral. When the Church Street property was sold, plaintiff had a third lien position. Had debtors used the MMB loan money to pay off their line of credit, plaintiff would have been in a second lien position.

The only remaining § 523(a)(6) question is whether debtors possessed the requisite intent. Not all conversions create non-dischargeable, "willful and malicious" injuries. Thus "(a) claim founded upon a mere technical conversion, without conscious intent to violate the rights of another, and under mistake or apprehension, is dischargeable." *In re Behr*, 42 B.R. 922, 925, *citing Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). The courts are divided, however, on the exact nature of the intent that makes a conversion "willful and malicious:"

> The bankruptcy courts that have decided this matter have been divided as to whether the statute requires an intentional act that results in injury, or an act with intent to cause injury.

*Perkins v. Scharffe*, 817 F.2d 392 (6th Cir. 1987). *See also, In re Salamone*, 71 B.R. 69 (E.D.Pa.1987) (Discussing the conflict between the circuits but not deciding the appropriate standard for use in this district).

A review of the bankruptcy cases from this district suggests that we have previously required that plaintiffs prove (1) a deliberate or intentional act, and (2) an intent to injure. *In re Behr*, 42 B.R. 922, 925, *In re Lean*, 18 B.R. 189, 191. The instant case presents clear and convincing[9] evidence of debtors' intent to injure. We begin with the undisputed fact that debtors knew that plaintiff would receive the stated lien positions only if the MMB loan monies were applied in a specific fashion. *See* debtors' answer, para. 13. Further the testimony of both debtors reveals that they were aware of the consequences of their actions. Debtors were educated individuals: debtor wife completed two years of college, and debtor husband had a degree from Princeton University N.T. at 65. In addition, they were not neophytes in the

---

(direct indication from debtor to plaintiff bank that $11,000.00 note would be paid directly from certain sales).

**9.** Although not discussed by the parties, no clear consensus exists on the appropriate burden of proof on § 523(a)(6) issues. Our District Court did not reach the issue of the correct standard in the most recent decision on the subject. *Homemakers, Inc. v. Salamone*, 71 B.R. 69, 70–

71 & n. 1 (E.D.Pa.1987). The choice of standard was not an issue, however, because the appellee had not met even the *less* stringent preponderance standard. *Id.* Similarly, our assessment of the credibility of debtors' testimony in the instant case is such that we are not forced to compare shades of gray; we find that plaintiff has proven under the *more* stringent clear and convincing standard that debtors have violated § 523(a)(6).

business world. They had run Tanomar since its inception in 1972, and worked with the business through several years of financial difficulty. N.T. at 56.

We find less than credible debtor wife's testimony that she didn't understand the whole concept of liens at the time that the refinancing occurred. She had been involved with the business since its inception in 1972, "... on a more increasing level as the years went on." N.T. at 56. Prior to 1982, she was the manager of and buyer for the ladies department of the store. N.T. at 65. In early 1982, debtors decided that debtor wife was capable of assuming all responsibility for day-to-day store operations, which she did in March of 1982. N.T. at 57. It strikes us as odd that a person of such responsibility would have attended the August 1982 settlement conference but walked away with no real understanding of the significance of the transaction. See N.T. at 58 (debtor wife's testimony that she did not review the settlement sheet even though her husband did so), at 59 (statement that she heard the conversations between the attorney and her husband "[i]n a peripheral way"). Although she testified that she did not remember signing the commitment letter [10] (which was addressed to her husband), we are not convinced that she was unaware of its contents. N.T. at 68. We believe that debtor-wife, as a business-person would have had the acumen to understand exactly what plaintiff hoped to achieve through the loan and creation of lien positions.

We admit that it is far easier to find the requisite intent on the part of

debtor husband. It is undisputed that he saw the settlement sheet. N.T. at 6, 25. The settlement sheet indicates that at the time of settlement debtors owed the following on the FNBA loan: (1) $75,000.00 as principal and (2) $11,298.29 as interest (or a total of $186,298.29). N.T. at Plaintiff's Ex. 6. Thus, when debtors paid the $170,-000 in loan money to FNBA, they still owed FNBA an additional $16,298.29. In spite of this, debtor husband testified that he "felt" that the balance after payment of the $170,000.00 was only $5,000.00. N.T. at 44. We find this to be a self-serving miscalculation in light of his clear knowledge of liens and priorities. N.T. at 34-40.

Even assuming some lesser intent on the part of debtor wife, we would have no hesitancy imputing debtor husband's intentions to her under agency theory. See e.g., La Trattoria, Inc. v. Lansford (In re Lansford), 822 F.2d 902, 905, 16 B.C.D. 496, 498 (9th Cir.1987) (after the court found at least some evidence of the wife's separate culpability, it noted that actual participation in the fraud by a party is not required if the party knew or should have known of the agent's fraud, or was recklessly indifferent to the agent's acts). See also Ford Motor Credit Co. v. Emporelli (In re Emporelli), 42 B.R. 814 (Bankr.W.D. Pa.1984) (debtor-owner had knowledge of business manager's transactions).

The ribbon binding this package of less than credible testimony is the statement of both debtors that a check for an additional $5,000.00 was written and sent to plaintiff

---

10. Even if debtors have not waived their parol evidence objections, *supra* note 2, we would allow admission of the commitment letter on the issue of debtor intent. Parol evidence is prohibited if it is offered to vary or contradict the terms of an integrated, unambiguous contract. *American Bank & Trust Co. of Pa. v. Lied,* 409 A.2d 377, 487 Pa. 333 (Pa.1979). Evidence offered to prove intent does not vary or alter the contract. *See e.g., Hollander v. Friedman,* 59 A.2d 892, 360 Pa. 20 (1948) (agreement admitted to show common knowledge of the parties regarding essentiality of permit); *Pantano v. Zamer Motor Sales Co.,* 85 A.2d 681, 685, 170 Pa.Super. 317 (1952). This principle has been applied in bankruptcy cases to allow the admission of

evidence to show the intent necessary to prove a § 523 case. *Bankers Trust Co. v. Lichstrahl (In re Lichstrahl),* 27 B.R. 46, 47–48 (Bankr.S.D.Fla. 1983).

Independently, we would allow introduction of the commitment letter because several documents comprising a single agreement should be read together. *Petrie v. Haddock,* 119 A.2d 45, 384 Pa. 7 (1956); *Angelcyk v. Angelcyk,* 33 West. 137 (1951), *aff'd.* 80 A.2d 753, 367 Pa. 381. This principle has been applied to allow joint reading of (1) a commitment letter; (2) a purchase and sale agreement; (3) the underlying note and (4) the deed of trust securing the note. *Pendleton Green Associates v. Anchor Savings Bank,* 520 S.W.2d 579, 584 (Tex.Civ.App.1975).

—and their inability to produce a copy of that check at this Court's request.

■ Debtors have emphasized that their decision to use the MMB funds as they did allowed them to stay in business for an additional period of time, during which they were able to pay plaintiff for an additional $24,000.00 or $25,000.00. Our predecessor, Chief Judge Goldhaber, discussed a similar argument: "(w)e think this (the use of the funds) is irrelevant, since the willful and malicious act had already been performed by the debtor." *In re Allavena*, 31 B.R. 73, 74 & n. 5 (Bankr.E.D. Pa.1983) (parenthetical added). We agree with Judge Goldhaber's analysis.

We are aware that our conclusion that debtors violated § 523(a)(6) but did not violate § 523(a)(4) places this case in an unusual posture. We have no doubt that in the vast majority of cases a § 523(a)(6) violation would not exist absent a § 523(a)(4) violation. The question is whether malicious intent can exist where fraudulent intent does not. The critical distinction in this case is that we did not decide the § 523(a)(4) embezzlement claim on the issue of intent—we decided that the necessary entrustment did not exist.

■ We must now consider the two components of the damages alleged by plaintiff. On April 15, 1983, debtors sold the property located on Church Street. Plaintiff alleges that it was entitled to a second lien, but ended up with a third lien because the FNBA loan had not been satisfied. At the settlement, FNBA, which was in the second lien position, received $10,-559.09 ($9,270.24 balance plus $1,288.85 in attorneys fees).

As our District Court noted, in "... tort actions, damages are awarded to compensate for all loss suffered by breach of duty." *Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc.*, 457 F.Supp. 1158, 1165 (E.D.Pa.1978). Under Pennsylvania law, a plaintiff must prove damages resulting from a tort with

"reasonable certainty." *Barnes v. United States*, 685 F.2d 66, 69 (3d Cir.1982). On the other side, the party trying to reduce damages must meet the burden "... of producing evidence to show the proper reduction." *Id.* at 69, *citing Funston v. United States*, 513 F.Supp. 1000, 1010 (M.D.Pa.1981).

Debtors argue that plaintiff would be entitled, at most, to 74% of the amount paid to the second position lien holder, because plaintiff and MMB had a pari passu relationship expressed as a 74%/26% split of proceeds. We have found no evidence supporting this percentage split. If this is a pari passu relationship, debtors are not the proper parties to assert the relationship because it is not a defense as to them.[11]

This leaves us with plaintiff's loss of lien position, and the undisputed settlement figures. We find that plaintiff has established with reasonable certainty a loss in the amount of $10,559.09.

■ As an additional component of damages, plaintiff claims that debtors' failure to pay off FNBA left FNBA in a strong bargaining position. Plaintiff claims that FNBA used this position to obtain additional payments from Tanomar from September 1982 through May 1983. These additional payments totalled $33,-852.00. Plaintiff suggests that the money would have been paid to plaintiff had it not been paid to FNBA.

We disagree with plaintiff's argument. In November, 1982, a committee was formed to monitor Tanomar. N.T. at 48. The members of the committee included representatives of FNBA, plaintiff and the Rubane Company, plus two attorneys. N.T. at 47–48. The committee met bi-weekly or weekly and directed debtor wife to pay certain business bills. N.T. at 64. Thus, while it is possible that plaintiff *might* have been paid had the FNBA loan not been outstanding; it is far from certain. We cannot assume that the commit-

---

**11.** In the spirit of debtors' argument, we will order the Deputy Clerk In Charge of Reading Divisional Office, U.S. Bankruptcy Court for the Eastern District of Pennsylvania to mail a copy of our order in this case to Marine Midland Bank, to provide that entity with information to determine whether it has entitlement to any portion of plaintiff's award.

tee members would have agreed to make those same payments to plaintiff. The funds might have been used to pay other creditors, as additional salaries, or for other business-related purposes. Plaintiff has not shown this element of damages with "reasonable certainty."

We reject debtors' argument that no demand [12] occurred. The Note explicitly waives [13] debtors' rights to demand.

The non-dischargeable portion of debtors' obligation to plaintiff is $10,559.09. An appropriate order will follow.

---

12. The Note provides in relevant part:
Principal payable ON DEMAND, but if no demand is made by Bank, then in four quarterly installments of $8,000.00 each commencing December 1, 1982, four quarterly installments of $9,000.00 each thereafter, and quarterly installments of $10,000.00 each thereafter until the entire unpaid principal balance is paid in full ...
N.T. at Plaintiff's Ex. 4, p. 2.

13. The Uniform Commercial Code, codified in Pennsylvania at 13 Pa.C.S.A. 3101 *et seq.*, governs the rights and liabilities of parties with respect to commercial paper. Parties may agree to waive presentment or demand:
3511 Waiver or excused presentment, protest or notice of dishonor or delay therein
 * * * * * *
(B) Excused presentment, protest or notice of dishonor.—Presentment or notice or protest as the case may be is entirely excused when:
(1) the party to be charged has waived it expressly or by implication either before or after it is due.
13 Pa.C.S.A. § 3511.