In re Kevin Blaine FONTENOT and Joan Miller Fontenot, Debtors.

Conley DUTREIX and Magdelen J. Dutreix, Plaintiffs,

v.

Kevin Blaine FONTENOT and Joan Miller Fontenot, Defendants.

Bankruptcy No. 87–51205–LO–07.
Adv. No. 87–50125.

United States Bankruptcy Court, W.D. Louisiana, Lafayette–Opelousas Division.

June 13, 1988.

H. Kent Aguillard, Eunice, La., for debtors.

Hugh Wm. Thistlethwaite, Jr., Opelousas, La., trustee.

Aaron Frank McGee, Eunice, La., for plaintiffs.

## MEMORANDUM OF BENCH DECISION ON ADVERSARY PROCEEDING TO DETERMINE DISCHARGEABILITY OF DEBT

W. DONALD BOE, Jr., Bankruptcy Judge.

This adversary proceeding came on for trial on the complaint of Conley Joseph Dutreix and his wife Magdelen Dutreix, alleging non-dischargeability of a particular debt under Bankruptcy Code section 523(a)(2)(A), based on money obtained by false pretenses, false representation, or actual fraud. Plaintiffs also sought non-dis-chargeability based upon section 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The defendant's case, supported by substantial psychiatric evidence, was based on bi-polar depression involving radical mood swings of belief and behavior.

This Court overruled the exceptions to dischargeability, holding the debt to the plaintiffs fully dischargeable. This memorandum memorializes the findings of fact and conclusions of law which constitute the basis for the bench decision given on the last day of trial.

## FINDINGS OF FACT

Plaintiff Conley Joseph Dutreix, age 40, is President of the First Bank of Eunice. He and his wife arranged with defendant Mr. Fontenot to have him perform a renovation and addition project on the Dutreix home. Defendant Kevin Fontenot, age 28, has a degree in architecture. The work was performed satisfactorily except that Mr. Fontenot failed to pay a number of material suppliers who filed liens on the Dutreix house. Mr. Dutreix will be out of pocket $15,588.99 as a result of the liens, some of which have been reduced by negotiation.

Mr. Fontenot, a Lafayette resident, was originally from Eunice. Mr. Dutreix was familiar with defendant's family on both sides but he did not know Mr. Fontenot personally. Mr. Dutreix retained Mr. Fontenot after contacting two of his previous clients regarding work he had done for them.

The one-page estimate dated January 10, 1987, is the agreement to perform the work and signaled inception of the work. (Dutreix Exhibit 10, page 1.) It estimates cost at $25,390.00. This was later reduced because the job cost less than Mr. Fontenot estimated.

Mr. Dutreix was approached at various times by Mr. Fontenot for partial payments essentially on a percentage of completion basis. He received the following checks drawn by Mr. Dutreix: $5,570.00 on February 26, 1987; $9,000.00 on March 25, 1987;

$5,000.00 on April 14, 1987; and $3,000.00 on April 24, 1987. (Dutreix Exhibit 1). These checks total $22,750.00. Evidence of unpaid liens is shown on Dutreix Exhibits 2 through 9. Identities of most of the materialmen (in number and dollar amount of claims) are set forth on pages 2, 3 and 4 of Exhibit 10 dated March 21 (of 1987). These pages form a type of budget Mr. Fontenot presented to Mr. Dutreix. Mr. Fontenot testified essentially that he never volunteered the information that the materialmen's liens had not been satisfied.[1]

Mr. Fontenot testified that he assumes that Mr. Dutreix would not have paid him the checks if he had told Mr. Dutreix that the materialmen had not been paid.

Mr. Fontenot testified that he used the money received from Mr. Dutreix to pay suppliers' bills on prior projects and that when he so used the funds, he did not perceive himself as being in financial trouble. Mr. Fontenot testified he did not explain to his clients that he was using their money because none of his bills was overdue thirty days. He testified further that the Dutreix bills became delinquent after he had completed the job. He testified that he never perceived himself as being in financial trouble until he was hospitalized for a condition diagnosed as bi-polar depression (manic-depressive).

This testimony is somewhat inconsistent with what he apparently told medical personnel after his commitment to a mental hospital. He complained after he was first committed to the hospital that he might go into bankruptcy if he didn't get to work. Mr. Fontenot's testimony has to be viewed with some discretion and judgment in view of the specific nature of bi-polar depres-

sion. At the time of the trial, for example, Mr. Fontenot was taking Lithium, used to bring patients down from a "high" or manic state, and, Elavil, an anti-depressant. These medications, the Court finds, are consistent with the diagnosis of bi-polar depression involving states of mental grandiosity and high physical activity alternating with other different periods of depression. The medical records do not seriously contradict Mr. Fontenot's testimony. The Court finds his testimony generally credible.

Mr. Fontenot's attorney portrays him as guilty only of poor judgment and lack of discretion. There is considerable evidence in the record to support this.

Mr. Fontenot testified that he had problems making decisions in late 1986 and early 1987, even small decisions, like what he should eat, what he should wear, and where he should park. Mrs. Fontenot testified that in late 1986 and early 1987 there was a gradual change in Mr. Fontenot's behavior. He was withdrawn and indecisive. He moved to a motel for a few days apparently so that he could attempt to get work accomplished. He took on far too many responsibilities at the same time: architecture, construction, and even doing his own typing and bookkeeping.

Mr. Fontenot's father-in-law, Dr. Jack Miller, an optometrist, testified that Kevin Fontenot's behavior was vacillating. He would start one task and then break that off and then start another. Mr. Fontenot was committed by his family into Insight in Youngsville in the second week of May 1987 after a bizarre "running away" to Omaha, where he knew no one. (He drove to the Baton Rouge airport where he sim-

---

1. Mr. Dutreix testified he never asked Mr. Fontenot whether the liens had been satisfied. At no time here pertinent did Mr. Dutreix ever ask Mr. Fontenot for lien waivers. He testified that as bank president he would use lien waivers but not on a job this small. He testified that a person arranging for lien waivers for construction work with a contractor has to rely on the contractor to identify the persons from whom lien waivers have to be obtained, the implication being that lien waivers do not provide absolute protection from liens.

The Court finds that Mr. Dutreix could have adequately protected from himself from the vast bulk of the liens by insisting on lien waivers. Also, while not argued by defendant's counsel, on the occasions that Mr. Fontenot came to him for partial payments, Mr. Dutreix instead of making the checks payable to Mr. Fontenot could have arranged for payments to most of the materialmen. This Court emphasizes, however, that these findings are not relevant to the result reached in this proceeding, because dischargeability turns on the debtor's behavior and state of mind, not Mr. Dutreix's.

ply took the first plane leaving—for anywhere.) Mr. Fontenot had been sleeping little if at all for a long period prior to his institutionalization at Insight and hardly slept at all while there. He was then transported to Cypress Hospital.

Defendant's Exhibits F–1 through F–16 document the medical history of Mr. Fontenot as does the deposition of Dr. William P. Cloyd (defendant's Exhibit F–17). Dr. Cloyd, a psychiatrist, testified that Mr. Fontenot was a bright person with impaired judgment and disorganized thinking (deposition p. 7). The Court finds this diagnosis consistent with the fact Mr. Fontenot scored only 107 on an IQ test at Insight while he had been an A and B student in architecture.[2] Dr. Cloyd testified that Mr. Fontenot had marked mood swings, and elevated and expansive mood, and hyper-activity (deposition p. 6). Dr. Cloyd in describing Mr. Fontenot's condition stated:

> It is like what you would have on a good day magnified 20 times over in which you feel well with some grandiosity and expansive mood. This is a cyclic kind of condition that then can result in a person at other times going into depressive states of said prominent and persistent depressed mood, being slowed down both physically usually, less energy, less interest, less activity and slowed mentation or thinking, and an individual may cycle between these, say, the ups and downs which again are the same words for manic and for depressed.

Deposition, p. 8. When asked whether the condition that he had diagnosed on the May 29, 1987, existed three or four months prior to that time, Dr. Cloyd responded that the history indicated increasing problems and difficulties extending throughout 1986 and, he thought, actually extending back over the past two years (deposition p. 14). Dr. Cloyd testified that Mr. Fontenot would have understood what he was doing in entering into a contract in early 1987 and that he would have understood that he was supposed to pay materialmen, because he was not psychotic (deposition, pp. 16–17).

On the other hand, Dr. Cloyd testified that defendant's judgment was diminished and impaired by "the expectation that with his expansive elevated mood that whatever he was doing was going to work out and he was going to manage," though he would have known right from wrong (deposition, pp. 18–19). Dr. Cloyd's testified that with Mr. Fontenot's disorder, he would at times be overconfident in his ability to conduct his affairs. Coexistent with "expansiveness [or] grandiosity," there was impaired "ability to make rational judgments and formulate workable plans to plan ahead to do something concrete" (deposition, p. 20). The Court finds this diagnosis credible and consistent with Mr. Fontenot's behavior.

Defendant's medical records (Defendant's Exhibits F–1 through F–16), admitted without objection, were generally consistent with the testimony of all defendant's witnesses. The defendant had become isolated and withdrawn. He failed to take pleasure in leisure time activities he had formerly enjoyed. He endured prolonged sleeplessness.

The psychological and psychiatric reports indicate states of great physical activity and feelings of power and self-esteem alternating with other periods of depression and helplessness. His chief complaint at Cypress Hospital was; "I can't think like I used to—I want help." The medical history at Cypress (Exhibit F–15) also indicates disheveled appearance and that Mr. Fontenot could not work at home because he found it too distracting. At Cypress, Halcion was administered to help correct sleeplessness.

This Court finds that Mr. Fontenot, because of bi-polar depression, could not think as he formerly did and was both mentally and emotionally impaired during all events pertinent to this case.

The Court is convinced based upon the evidence that Mr. Fontenot by late 1986 was suffering severe depression that substantially altered his normal day-in and

---

**2.** A psycho-social assessment at Cypress Hospital apparently based upon information provided by Mr. Fontenot indicated Defendant had a 3.4 average in architecture. This is consistent with his father-in-law's description of him as an A and B student.

day-out ability to function effectively. Indecisiveness even in small matters, vacillation, inability to concentrate, loss of a sense of the normal pleasures of life, and lack of interest in them, drastically reduced sleep, loss of neatness of appearance, and depressed "affect" (or appearance)—all combine to present a convincing picture of severe depression. Hospital records also indicate some contemplation of suicide. Mr. Fontenot at times suffered drastic losses of self-esteem and confidence so that he could not believe in himself, or even make the smallest of decisions. At other times he was overly confident—on a manic "high"—and imposed responsibilities, obligations, and duties upon himself that he simply could not carry out. This paradoxical behavior is consistent with the diagnosis of bi-polar depression. The diagnosis of bi-polar depression is also consistent with Mr. Fontenot's inconsistent or sharply alternating views of his financial prospects prior to and during his hospitalization.

## CONCLUSIONS OF LAW

Plaintiff's first basis for seeking nondischargeability is section 523(a)(2)(A) for money obtained by false pretenses, false representation, or actual fraud. Money was obtained by defendant through various draws under the facts that set forth above. Was it obtained by false pretenses, a false representation, or actual fraud? Collier notes that the frauds included in section 523(a)(2)(A) are those involving moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality is insufficient. 3 *Collier on Bankruptcy* para. 523.08[4] (15th ed. 1988).

Collier cites numerous cases in support of these propositions.

Although the cases cited in Collier are not entirely consistent, it also appears that if representations knowingly and fraudulently made are not reasonably relied upon by the plaintiff, there is no basis for nondischargeability. In the present case defendant came to plaintiff to obtain draws under their agreement. Defendant did not represent that materialmen had been paid

and plaintiff did not question him about this. Although plaintiff had familiarity with lien waivers, and also could have drawn checks in favor of materialmen to assure they were paid and that there would be no liens, I seriously question whether this would make plaintiff's reliance on any representation unreasonable.

The misrepresentation required to bar discharge is a misrepresentation by the debtor of *his intention.* A misrepresentation of intention that constitutes false representation is to be distinguished from a mere promise to be executed in the future which will not bar discharge, even if there is no excuse for the subsequent breach. 3 *Collier* para. 523.08[4].

In the case at bar the evidence is clear and credible that defendant did intend to pay potential lienors. His failure to pay his suppliers at the time he was paid by the plaintiff does not preclude a valid intention to pay them subsequently. While the evidence is clear that defendant Fontenot used money from the Dutreix project to pay materialmen on other jobs, defendant Fontenot still intended to pay the suppliers on the Dutreix project.

Defendant in this case made no *overt representation* that he would pay materialmen. In *Sears Roebuck and Company v. Wood,* 571 F.2d 284 (5th Cir.1978), defendant Wood purchased goods on his Sears account without referring to his ability to pay, and Sears sought an exception to discharge based on false pretenses or false representations. The Court held that absence of explicit representations concerning financial conditions by the bankrupt required a holding that there had been no false pretenses or false representations, citing *Davison–Paxon Company v. Caldwell,* 115 F.2d 189 (1940).

Just as Sears did not ask the Wood his financial condition and Wood made no explicit representations regarding it, Mr. Dutreix in the case at bar did not ask Mr. Fontenot whether he had paid materialmen or potential lienors, and Mr. Fontenot did not volunteer information. There are factual differences between *Wood* and the

case at bar, but they do not appear pertinent here.

■ Fraudulent intent may be inferred even when there is *no overt representation,* provided that hopeless insolvency would make payment impossible. But there is no evidence that defendant Fontenot was hopelessly in debt at the time he committed to work on the Dutreix house or later when he received a series of payments from Mr. Dutreix. Fontenot testified that he was meeting his bills within the usual 30 day payment period.

*Sears Roebuck and Company v. Boydston,* 520 F.2d 1098 (5th Cir.1975), declined to reverse a decision that obligations were dischargeable even the debtors though in a 15–month period had incurred almost $32,000.00 in new indebtedness, mostly for luxury items and nonessential expenses. The Court essentially viewed the debtor's activities as more optimistic than as intentionally deceptive. Defendant Fontenot in the case at bar likewise engaged in behavior based upon optimism rather than an intention to deceive.

This Court concludes that defendant Fontenot engaged in no false pretenses or false representation within the meaning of Section 523(a)(2).

Section 523(a)(2) can also prevent discharge if there is "actual fraud." 3 *Collier on Bankruptcy,* para. 523.08[5] defines actual fraud as follows:

Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.

■ Collier notes that actual fraud has to be proven by clear and convincing evidence. No clear and convincing evidence of a direct and active operation of the mind to cheat or deceive exists in this case. Mr. Fontenot's manic states during bi-polar depression, together with credible testimony that it is his intent to pay the materialmen on the Dutreix job, precludes a finding that he directly and actively intended to cheat another. Mr. Fontenot's experienced high states of optimism is consistent with subjective good-faith intent to fulfill his obligations.

Lest there be any misunderstanding, the Court is *not* saying that bi-polar depression would have made it impossible to design and execute a plan to cheat. Rather, bi-polar depression explains Mr. Fontenot's optimism in believing that he could pay his suppliers.

The facts in the present case contrast strongly with *In re Hutchinson,* 27 B.R. 247 (E.D.N.Y.1983), where a debtor with a $6,000.00 annual income ran up more than $220,000.00 in consumer and other debts during a 15–month interval and unsuccessfully attempted to defend based upon an alleged mental affliction not corroborated by any testimony of either mental health professionals or lay witnesses. In the present case, there is substantial evidence from hospital records, deposition testimony of psychiatrist William P. Cloyd, and testimony of close relatives of Mr. Fontenot, all leading to a conclusion that he was suffering from bi-polar depression with alternating states of great optimism and great depression. This Court concludes defendant Fontenot lacked the intent necessary for false pretenses, false representation, or actual fraud under section 523(a)(2) of the Bankruptcy Code.

■ Plaintiff also contends that defendant Fontenot should be denied a discharge based upon section 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Collier explains this statutory language as involving an exception to discharge based on "(1) fraud or defalcation while acting in a fiduciary capacity and (2) embezzlement or larceny whether or not acting in a fiduciary capacity." 3 *Collier on Bankruptcy* para. 523.14[3].

Collier defines larceny as "the fraudulent and wrongful taking and carrying away theproperty of another with intent to convert such property to his (the taker's) use without the consent of the owner." 3 *Collier* para. 523.14[3]. In the present case there can be no larceny because Mr. Du-

treix voluntarily made the payments to defendant Fontenot.

■ Embezzlement is defined by Collier at paragraph 523.14 as:

the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

The facts of the present case are inconsistent with fraudulent intent. The work defendant had engaged to perform had been completed at various stages when he received payments; further, he intended to pay the materialmen. Fraudulent intent requires moral turpitude or intentional wrong. *See Neal v. Clark,* 95 U.S. (5 Otto) 704, 24 L.Ed.586 (1878). There can be no embezzlement because fraudulent intent, moral turpitude, or intentional wrong were not present.

■ The question remaining for decision is whether defendant has engaged in defalcation while acting in a fiduciary capacity. Defalcation reaches acts other and broader than embezzlement (provided that the defendant is a fiduciary). Defalcation does not require criminal or malicious, conduct. If a fiduciary relationship exists, non-dischargeability by virtue of defalcation can exist irrespective of whether or not there was intentional wrongdoing. *See Central Hanover Bank & Trust Company v. Herbst,* 93 F.2d 510 (2nd Cir.1937), interpreting Section 17(a)(4) of the Bankruptcy Act, which is substantially similar to Section 523(a)(4) of the Bankruptcy Code.

Judge Learned Hand in *Central Hanover* noted that defalcation under bankruptcy law can involve an innocent default by a fiduciary who for any reason was short in his accounts. *Central Hanover* at 512. Defalcation appears to be the only cause for non-dischargeability under section 523(a)(4) that does not require criminal or malicious conduct or intent.

■ A defalcation is basically a failure to account for funds. But to create a nondischargeable debt, defalcation must be accompanied by a fiduciary capacity of the debtor. *In re Johnson,* 691 F.2d 249, 254–255 (6th Cir.1982), opines that no element of bad faith or intent has to accompany a defalcation. *Johnson* gives this explanation of why an intentional act is unnecessary for defalcation:

Although the "badness" of fraud, embezzlement or misappropriation is readily apparent, creating a debt by breaching a fiduciary duty is a sufficiently bad act to invoke the Section 17(a)(4) exception [the substantial equivalent of Code section 523(a)(4) ] even without a subjective mental state evidencing intent to breach a known fiduciary duty or bad faith in doing so. This is because the requisite "badness," to conform with the spirit of the bankruptcy laws, is supplied by an individual's *special legal status with respect to another, with its attendant duties and high standards of dealing,* and the act of breaching these duties.

691 F.2d at 256 (emphasis added). The "special legal status" to which Johnson refers is one created by an express or technical trust. An implied trust will not suffice for nondischargeability. Collier states:

The qualification that the debtor be acting in a fiduciary capacity has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose.

3 *Collier on Bankruptcy,* para. 523.-14[1][c].

■ A technical or express trust requires (1) sufficient words to create a trust; (2) a definite subject; and (3) a certain and ascertained object or *res.* *Wilmington Trust Co. v. Martin (In re Martin),* 35 B.R. 982, 985 (Bankr.E.D.Pa.1984). In the present case I can find no intent to create a trust. Nor can I find any *res* that would be related to the contract to perform the work at the Dutreix residence (in part be-

cause there was no restriction on the use of funds obtained under the contract). The mere fact that a creditor places some trust or confidence in the debtor does not create an express or technical trust. *Martin*, 35 B.R. at 987.

■ This Court without any urging by counsel has examined Louisiana statutes to determine if one or more of them may have imposed a fiduciary duty on defendant Fontenot. A state statute can impose a fiduciary relationship within the meaning of section 523(a)(4), provided that the statute imposes a trust on the funds *prior to the act* creating the debt and spells out fiduciary duties. *See In re Gagliano*, 44 B.R. 259, 261 (Bankr.N.D.Ill.1984). "[T]he trust must have existed prior to the wrongdoing from which the debt arose." *In re Martin*, 35 B.R. at 985; *see also* Justice Cardozo's opinion in *Davis v. Aetna Acceptance Company*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934).

■ Under the Louisiana Private Works Act, "A contractor shall indemnify the owner for claims against the owner arising from the work to be performed under the contract. A subcontractor shall indemnify the owner, the contractor, and any subcontractor from or through whom his rights are derived, for amounts paid by them for claims under this part [the Private Works Act] arising from work performed by the subcontractor." La.Rev. Stat.Ann. sec. 9:4802 F (West 1983). This indemnification provision fails to rise to the status of a provision creating a fiduciary duty. There is no "trust" language, nothing indicating an intention to create a trust, and no required *res*. These same conclusions apply to Section 4855 of the Private Works Act. Section 4855 merely creates a civil cause of action in favor of the owner when a contractor fails to comply with the provisions of the Private Works Act.

Looking further, the Court notes in the Louisiana Criminal Code a statute prohibiting any contractor who has received money for work on a building or structure from knowingly failing to apply the money as necessary to settle claims for materials and labor. La.Rev.Stat.Ann. sec. 14:202 (West

Supp.1988). The penalty for violation is fine, imprisonment, or both; in addition the state court can order the offender to make restitution. Any trust that may be created by these provisions is no more than *ex maleficio*. This Court finds in these provisions no intent to create a trust *prior to the time of the wrongful act* that would support a conclusion that there has been defalcation while acting in a fiduciary capacity within the intendment of section 523(a)(4) of the Bankruptcy Code.

This Court has found two decisions involving state statutes imposing fiduciary relationships or contractors who are obligated to pay materialmen or potential lienors. But neither involves a state statute similar to section 202 of the Louisiana Criminal Code. *In re Johnson*, 691 F.2d 249 (6th Cir.1982), involved a Michigan statute that expressly made a building contract fund a "trust fund" for the benefit of the person making payment, subcontractors, and materialmen. It also expressly made the contractor a "trustee." *Johnson* stated the Michigan statute unambiguously imposed a trust relationship before any act of wrong doing clearly defined the trust *res* as the monies paid by any person into the building contract fund, and charged contractor-trustees with specific affirmative duties including paying trust funds in accordance with a statutorily imposed priority scheme. The Louisiana statute is considerably different.

*In re Martin*, 35 B.R. 982, considered a Delaware statute providing that all monies received by contractor for a building were "trust funds" in the hands of the contractor. The monies became trust property under the statute as soon as received by the contractor. While the Delaware statute carried criminal penalties, the court noted that statutes that are solely general criminal statutes are by the weight of authority an insufficient basis for imposing fiduciary liabilities under section 523(a)(4) of the Bankruptcy Code; this rule did not apply if the defalcation arose *after* the imposition of the fiduciary obligations. Since fiduciary obligations were imposed at the inception of receipt of any money, the

trust was not imposed *ex maleficio* and therefore created a fiduciary relationship under section 523(a)(4) making obligations of the defendant nondischargeable. This Delaware statute is of course considerably different from the Louisiana statutes previously cited.

Somewhat similar to the *Johnson* and *Martin* cases is *In re Gagliano*, 44 B.R. 259, which examined an Illinois statute specifically providing that an insurance agent who collects premiums holds them in a fiduciary capacity. *Gagliano* noted that the Illinois statute created the trust independently of the act giving rise to the debt (i.e., not *ex maleficio*). *See also, In re Thomas*, 729 F.2d 502 (7th Cir.1984), involving a "trust fund" of monies received by a contractor for public improvements. The Louisiana statutes contain no "trust" language.

The contrast between the Louisiana statutes and the statutes considered in the cited cases is fairly striking. This Bankruptcy Court concludes that defendant Fontenot is not a fiduciary under section 523(a)(4) because no contractual or statutory arrangements create any express or technical trust.

There was absolutely no evidence in this case that would link Mrs. Fontenot, a defendant in this case, to the funds received by Mr. Fontenot. Mrs. Fontenot had no significant role in the business at any time relevant to this adversary proceeding.

Accordingly, this Court holds there is no basis in section 523(a)(2) or section 523(a)(4) for holding that the unfortunate losses sustained by the plaintiffs are non-dischargeable.

For the foregoing reasons the Court DENIED all relief sought by the plaintiffs.