In re Cathy Christine BORSTE, Debtor.

NORDSTROM, INC., Plaintiff,

v.

Cathy Christine BORSTE, Defendant.

Bankruptcy No. 89–08064.
Adv. No. A90–01153.

United States Bankruptcy Court,
W.D. Washington,
at Seattle.

Aug. 3, 1990.

**996**

Grant E. Courtney, Lane Powell Spears Lubersky, Seattle, Wash., for plaintiff.

Marc S. Stern, Seattle, Wash., for defendant.

## MEMORANDUM OPINION

SAMUEL J. STEINER, Chief Judge.

### NATURE OF ACTION AND CONTENTIONS

Cathy Borste filed a Chapter 7 petition on November 7, 1989. Nordstrom filed a complaint, alleging that, from May through September, 1989, the debtor incurred credit card charges with no intention or apparent ability of paying them. As such, Nordstrom maintains that these charges are nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. Nordstrom relies on *In re Dougherty*, 84 B.R. 653 (Bankr.App. 9th Cir.1988). The debtor asserts as a defense that she suffers from an obsessive-compulsive disorder (known as OCD), a mental illness which deprived her of the ability to formulate the intent required to establish fraud under § 523(a)(2)(A).

### FACTS AND DISCUSSION

1. *Elements of Proof Under § 523(a)(2)(A).*

In *Dougherty*, the Bankruptcy Appellate Panel addressed the issue of nondischargeability of credit card obligations. Prior to *Dougherty*, the courts had attempted to adapt the elements traditionally applied in § 523(a)(2)(A) to such transactions, i.e. 1)

that the debtor made representations, 2) which he knew at the time to be false; 3) that he made the representations with the intention and purpose of deceiving the creditor; 4) that the creditor relied on the misrepresentations; and 5) that the creditor sustained the alleged loss as the proximate result of the representations. *Id.* at 656. Given the difficulty of proving these elements in credit card transactions, the courts had developed two avenues of approach. The majority espoused the "implied representation" theory, the premise of which is that when making a charge, a cardholder impliedly represents that he or she has the ability and intention to pay for the goods or services charged. A minority of courts had advocated the "assumption of risk" theory, which provides that the cardholder makes a false representation to the issuer only when he or she continues to use the card after revocation of the card has been communicated.

Each of the theories employs a fiction in order to satisfy the representation and reliance elements of fraud. The *Dougherty* Court rejected both theories, observing that, "in third party credit card transactions ... the concepts of representation and reliance have little meaning." *Id.* Instead, the Court adopted the test enunciated in *In re Faulk*, 69 B.R. 743 (Bankr.N.D. Ind.1986), which provides, " 'Where purchases are made through the use of a credit card with no intention at that time to repay the debt, that debt must be held to be nondischargeable pursuant to section 523(a)(2)(A).' " 84 B.R. at 657 (citing *Faulk*, 69 B.R. at 753–54). Under this analysis, the continued use of a credit card *after revocation* of the card has been communicated renders nondischargeable the liabilities incurred thereafter. As to *prerevocation* charges, the card issuer must prove by clear and convincing evidence that "the debt was incurred through actual fraud, i.e. where the debtor made the charges with no intention of paying for same." *Id.*

■ The plaintiff and defendant agree that subjective intent to deceive need not be shown under § 523(a)(2)(A). All that is

required is a showing of reckless disregard for the truth, i.e. that the debtor intentionally continued to incur charges after she knew or should have known that she lacked the ability to repay them. *In re Pedrazzini*, 644 F.2d 756 (9th Cir.1981). The *Dougherty* court identified twelve nonexclusive factors from which the Court may deduce the requisite intent in credit card transactions. They are as follows:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits;

12. Whether the purchases were made for luxuries or necessities.

*Dougherty* at 657.

2. *Application of Dougherty Factors.*

The *Dougherty* factors apply to the evidence as follows:

1) *Length of time between charges and filing bankruptcy.* Nordstrom is seeking a nondischargeability finding only as to those charges incurred by the debtor between May and September, 1989. Borste's last charge at Nordstrom occurred September 2nd, when she charged $170.13 in the beauty salon and an additional $43.24 on clothing. She went to Europe in the beginning of September and returned in mid-October. According to answers to interrogatories, Borste consulted an attorney on Oc-tober 20 and filed for bankruptcy on November 7th.

2) *Consultation of attorney.* While the debtor testified that she did not consult an attorney until October, she had in fact gone to Consumer Credit Counseling in June. According to the testimony, it was at this time that she first totalled her bills and was informed of bankruptcy as an option.

3) *Number of charges.* During the four-month period from May through August, 1989, the debtor incurred a minimum of ninety-two charges on seven credit cards, including thirty-six charges at Nordstrom. Of the Nordstrom charges, she incurred eleven in July and eighteen in August. Of the Bon Marche charges, she incurred eleven in July and twenty-one in August. In addition to the charges, her credit union advanced funds to cover checking overdrafts fourteen times.

4) *Amount of charges.* During the four-month period, the debtor's Nordstrom charges totalled $2,241.39 in merchandise and $400 in gift certificates (which were redeemed for cash). She returned $653.50 in goods, for a net total of $1,987.89. Of this amount, a net total of $1,247.53 (charges less returns) was charged in July and August alone. For the period May through August, the debtor's total credit card charges, including overdraft advances, were at least $10,287.89. She returned approximately $1,406.53 in goods and paid approximately $1,393.00 on these bills.

In *Dougherty*, the debtor had incurred multiple charges under $50, often in the same day from the same merchant. From this the Court inferred that the debtor was attempting to avoid verification of the charges. There is no pattern in the present case to support such an inference.

5) *Financial condition of debtor.* Currently and during the period at issue, the debtor worked at the University of Washington as a machinist. In her Statement of Affairs, she reports earnings of $26,000 in each of the years 1988 and 1989. In addition, she earned a minimal amount in an attempt at outside sales. She testified that her net income has been somewhere be-

tween $1,500 and $1,600 per month. She has no other source of income.

As reported on the Schedule of Current Income and Expenditures, her monthly expenses (*including* $100 for clothing, $140 for miscellaneous, and $100 for entertainment) total $1,535.00 per month. This does not include her car payment of $263.98 per month.

In May, 1989, the debtor owed nearly $18,000 in unsecured consumer debt, plus $6,000 on a loan secured by her car. The car loan was, at least in part, a consolidation loan to pay bills. In June, 1989, the minimum monthly payments on the debtor's credit cards totalled over $1,300, and by July they were over $1,800. These amounts do not include her $263.98 car payment. By the time she filed, the debtor owed a total of $29,623 in unsecured consumer debt, $2,380 for medical and accounting services, and $5,600 on the secured loan.

The debtor had no nonexempt property and only negligible savings. She has a 1986 Nissan automobile on which she owes the Credit Union approximately $5,700.

6) *Credit limits.* The debtor had $20,-600 available credit, *plus* a Frederick and Nelson "open" account with no stated limit. By June, 1989, the debtor had exceeded her credit limits on two bank cards. In response, U.S. Bank increased her limit from $2,500 to $3,100, after which she promptly increased her balance to over $3,200. By the first of September, she was well over the limit on all her cards, and was up to the limit on her line of credit with the Credit Union. She was $369.00 over the limit on her Nordstrom card by the first of September. Many of her statements contain over-limit fees, increased minimum payments, and notices that she had exceeded her limit. Thus the debtor knew or should have known that she had exceeded or was fast approaching the limits of her credit.

7) *Multiple charges on same day.* As indicated above, in *Dougherty* the debtor made multiple small charges on the same day at the same store, presumably in order to avoid verification of charges. In the present case, the debtor did in fact make multiple same-day charges at Nordstrom on numerous occasions. However, these retail account charges were incurred from different departments within the same store. Verification is not standard practice in such circumstances, and thus this factor is of no import.

8) *Employment.* As indicated above, the debtor was employed at the University of Washington, earning $26,000 per year and netting $1,500–$1,600 per month.

9) *Prospects for employment.* The debtor had no plans or prospects for more lucrative employment. An attempt at a small business had failed, and there was no evidence that she had explored more lucrative employment or additional employment to supplement her resources.

10) *Financial sophistication of the debtor.* The debtor is reasonably intelligent and has had two years of liberal arts studies in college, plus work-related training. She had credit for a number of years and was familiar with credit transactions and practices.

11) *Sudden change in debtor's spending habits.* It appears that the debtor had problems controlling her spending even before the four-month period between May and September, 1989. However, she testified that she had always been able to make her payments. In June, she went to Consumer Credit Counseling and was apparently told that they could not help her. She then went on an uncontrolled buying spree, which lasted through August, 1989. The payments on her car loan had been automatically withdrawn from her Credit Union account twice monthly. However, it appears that this practice was discontinued in mid-August. Further, it appears that the debtor's paycheck had been automatically deposited to her checking account each month, until August. Her checking account balance had been reduced to $1.00 as of the end of August. August was the month in which the debtor incurred 43 charges.

12) *Nature of purchases.* Most of the debtor's purchases were for luxuries, including the beauty salon (Nordstrom, Sep-

tember 2,—$170.00) cosmetics, clothing, shoes, handbags, cookware, household goods, and luggage (Bon Marche, August —$245.00).

The foregoing supports a conclusion that, from May through August, 1989, the debtor used her Nordstrom card with no intention of repaying the debt, or in reckless disregard of her ability to pay.

## DEFENSE OF MENTAL ILLNESS

The evidence indicates that people with OCD suffer from depression which results in obsessive and/or compulsive behavior. Some with the problem drink. Others eat or shoplift. This debtor's response to depression is obsessive and compulsive buying on credit. The debtor contends that her mental disorder deprived her of the ability to formulate the intent required to establish fraud. In support of her position, the debtor cites *In re Fontenot*, 89 B.R. 575 (Bankr.W.D.La.1988). In that case the debtor had done renovation work on the creditor's home. The debtor failed to pay suppliers with funds paid to him by the creditor with the result that liens were filed against the creditor's residence. The debtor suffered from bi-polar depression (manic depression), for which he took several different medications, and which had resulted in his hospitalization. A psychiatrist testified that the disorder caused extreme mood swings which impaired the debtor's judgment. On the one hand, he would experience an expansive, grandiose mood, leading to overconfidence coupled with an impaired "ability to make rational judgments and formulate workable plans to plan ahead to do something concrete." *Id.* at 579. Alternately, he suffered from severe depression, which "substantially altered his normal day-in and day-out ability to function effectively." His depression was characterized by "[i]ndecisiveness even in small matters, vacillation, inability to concentrate ... drastically reduced sleep," contemplation of suicide, etc. at p. 580. The Court concluded that the debtor's "bi-polar depression explained [his] ... optimism in believing that he could pay his suppliers." at p. 581. (*Note:* The case could have been decided without reliance on the debtor's mental illness, since the debtor had never represented that he was paying suppliers with the creditor's money, and there was no statutory or other trust to support defalcation of a fiduciary.)

▮ The *Fontenot* case supports the theory that the debtor's mental incapacity may be used in appropriate circumstances to rebut a showing of intent in dischargeability actions. The burden of proof is on the defendant.

> Every man is presumed sane and capable of managing his own affairs. Any party asserting mental incapacity bears the burden of proof.

*Matter of Hutchinson*, 27 B.R. 247 (Bankr. 1983).

The analysis in this case must begin with a focus on the type of intent that must be shown. The debtor agrees that, in the Ninth Circuit, § 523(a)(2)(A) does not require a showing of subjective intent to deceive, but rather a reckless disregard for the truth. This objective standard renders it nearly impossible for a debtor to successfully assert mental incapacity as a defense. Thus *In re Gaebler*, 88 B.R. 62 (E.D.Pa. 1988), is more instructive than is *In re Fontenot*. In *Gaebler*, a creditor had obtained a judgment against the debtor as a result of gunshot wounds inflicted by the debtor. The debtor had pled guilty to second degree attempted murder, which under state law is a general intent crime requiring not an intent to harm but rather an awareness that one's actions are likely to result in injury to another. The creditor filed a complaint under § 523(a)(6), alleging willful and malicious injury. In Bankruptcy Court, the debtor defended on the ground that he was depressed and under psychiatric care, that he was out of his mind at the time of the shooting and that he had not intended to harm the plaintiff. Interpreting § 523(a)(6) as requiring a specific intent to harm the creditor, the Bankruptcy Court held that the debt was dischargeable. The District Court reversed, adopting the view that "willful and malicious" requires a showing that the debtor intentionally performed a wrongful act,

which necessarily produces harm and is without just cause or excuse. Adopting a general intent standard for § 523(a)(6), the District Court held that the debtor's guilty plea to second degree attempted murder precluded him from relitigating the issue in bankruptcy court. Likewise, § 523(a)(2)(A) does not require a specific intent. It only requires that a debtor incur debt under circumstances objectively evidencing an inability to pay that debt. Whether the debtor subjectively realized that she would be unable to pay is immaterial.

■ Even applying a subjective standard of intent, the nature of the debtor's illness did not affect her ability to understand her behavior, but rather affected her ability to control it. The debtor's therapist testified that the debtor's illness was characterized by depression, panic, and an inability to control spending. On the other hand, the therapist also testified the debtor knew what she was buying and was capable of understanding she would have to pay creditors. The therapist further testified that the debtor would talk about having to stop buying, although most of her conversation related to her failed business and the need to make more money. In February the debtor told the therapist that she could not afford an additional $60 per month for therapy sessions, and by June the debtor told the therapist that she was in serious financial trouble. Finally, the debtor told the therapist that she was on a buying spree but would eventually be able to pay her creditors.

The debtor testified that she had been in a state of denial; and when asked directly whether she knew she could only pay so much based on her salary, she simply stated that she was "not thinking in those terms." In short, the debtor's illness was characterized by an inability to control her behavior in spite of the knowledge that she was in deep trouble. While there was testimony that the debtor believed she would be able to pay her debts, the basis for her conclusion was simply that she had always done so in the past. However, she had done so by obtaining further credit, and the evidence simply does not support a conclu-

sion that she believed additional credit would be available to her in the future. Unlike the debtor in *Fontenot*, the bi-polar depressive whose irrational overconfidence was a direct result of his illness, this debtor's belief and its foundation do not appear to be related to her disorder.

Finally, the debtor's conduct from May, 1989, to the date that she filed does not support the total lack of control she claims to have experienced. Her purchases included clothing, luggage, salon services, and household goods, all rational choices. She returned some items, indicating further deliberation in her choice of goods. In addition, she purchased large gift certificates, which she cashed to make payments on her accounts, demonstrating a conscious attention to her bills as well as an awareness that her resources were not sufficient to support her minimum payments. Finally, her spending spree continued after her visit with Consumer Credit Counseling and before her trip to Europe and ensuing chapter 7 filing.

In dischargeability cases, the defense of mental illness has generally failed for lack of proof. In *Hutchinson, supra,* a debtor with an annual income of $6,000 ran up over $220,000 in consumer and other debts during a 15–month period. A creditor sought a determination that its credit account was nondischargeable. The debtor maintained that a severe emotional disorder which necessitated outpatient psychiatric care, combined with the effects of drug therapy, distorted her perception and reasoning ability. She alleged that this impairment prevented her from realizing her precarious financial situation. The debtor failed to produce any admissible corroborating evidence of her illness. As such the Court found that she had not met her burden of rebutting the presumption of sanity and competence. In *In re Irvin,* 31 B.R. 251 (Bankr.D.Colo.1983), the debtor had assaulted a creditor, and the creditor brought an action under § 523(a)(6), alleging that the attack was willful and malicious. The debtor asserted that she suffered from premenstrual syndrome, a condition which deprived her of the ability to control her

conduct. In that case, Court stated as follows:

> I am asked to make a judicial determination that the attack by Jamie Irvin on Betty Lovato on April 27, 1979, was not willful and malicious but was, rather, proximately caused by Irvin's suffering from premenstrual syndrome. If that is the case, Irvin's debt to Lovato is dischargeable. However, if the conduct is not excused by PMS, and if it was willful and malicious, the debt is nondischargeable under 11 U.S.C. § 523(a)(6).... [The debtor] argues that she was unable to exercise her will, and that she was not able to formulate any intent. As she testified, it was as if 'someone else took over' her body. She would have the Court believe she was totally out of control as a result of her confusion, anxiety and hysteria. However, this is simply not borne out by the weight of the evidence.

*Id.* at 257, 258.

In conclusion, one final case bears mention, although not directly on point. In *In re Mistry*, 77 B.R. 507 (Bankr.E.D.Pa. 1987), the debtor, through false representations, had induced the plaintiff to invest $65,000 with him. There was no evidence as to what the defendant had done with the funds, but the Court concluded that the debtor had invested the plaintiff's money in the commodities market and lost it all. The debtor did not raise mental incapacity as a defense. However, the Court's observations are significant:

> Having said all of the foregoing, and indicated why we must rule in favor of the Plaintiff, we nevertheless must indicate that we are not without sympathy for the plight of the Defendant. His attraction to the commodity market, as he described it, was apparently an obsession. We believe that he was almost as powerless before the force of his obsession as is a compulsive gambler or a drug addict, who takes advantage of even those that he loves the most to fulfill his cravings. Thus, we believe that the Defendant has had no more intention of harming the Plaintiff than a gambler

does of losing, or than he had of losing his own home and his automobiles.

*Id.* at 513. The above quotation reflects an appropriate perspective on obsessive-compulsive disorders. One cannot help but be sympathetic toward the debtor, but the disorder does not relieve her of responsibility for her behavior. In short, the Court concludes that the debtor's conduct showed a reckless disregard for the truth, namely that she intentionally continued to incur charges at Nordstrom after she knew or should have known that she lacked the ability to pay.

### CONCLUSION

1. The debtor's mental illness does not relieve her from her financial obligations.

2. The obligation owed to Nordstrom is not dischargeable in bankruptcy.

3. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion shall serve as the Court's Findings of Fact and Conclusions of Law.

4. Counsel for the plaintiff will present an appropriate judgment for entry upon due notice to the attorney for the defendant.