In re Jacqueline A. MARUSIC, a/k/a Jacqueline A. Morgan, Debtor.

SEATTLE FIRST NATIONAL BANK, a national banking association, Plaintiff,

v.

Jacqueline A. MARUSIC, a/k/a Jacqueline A. Morgan, Defendant.

Bankruptcy No. 91–30733. Adv. No. 91–32292.

United States Bankruptcy Court, W.D. Washington.

March 19, 1992.

Kathryn A. Ellis, Weinstein, Fischer & Riley, P.S., Seattle, Wash., for plaintiff.

Charles F. Schmit, Jr., Bonneville, Viert, Morton & McGoldrick, Tacoma, Wash., for defendant.

## DECISION AND ORDER ON SUMMARY JUDGMENT

PHILIP H. BRANDT, Bankruptcy Judge.

Seattle–First National Bank ("Seafirst") has moved for summary judgment, presenting the following questions:

1. Whether Bankruptcy Code[1] § 524(b)(2) negates the injunction found in § 524(a)(3), permitting post-discharge enforcement of a pre-petition community claim against post-petition community property of the Debtor when the Debtor's spouse received a Chapter 7 discharge within the preceding six years, and would be barred from receiving a new discharge by § 727(a)(8);

2. Whether the Seafirst timely requested that determination;

3. Whether Debtor's obligation on credit card debt is nondischargeable under § 533(a)(2) in circumstances of this case; and

4. Whether Seafirst is entitled to attorney's fees.

In its Complaint Seafirst seeks only a determination of nondischargeability with respect to Jacqueline Marusic. Part of what Seafirst requests on summary judgment is outside that Complaint: effectively, a declaratory judgment that it may enforce Marusics' community obligation against community property acquired after Jacqueline Marusic's bankruptcy filing. I will treat Seafirst's motion as an amendment of its Complaint to that effect, and Ms. Marusic's Memorandum and Affidavit as her answer to the amendment.

## I. FACTUAL BACKGROUND

The pertinent chronology is:

1988 Debtor Jacqueline Morgan opened her Seattle–First National Bank ("Seafirst") MasterCard account as a single person.

24 June 1990 Debtor married Zeljko Marusic.

12 September 1990 Zeljko Marusic filed for relief under Chapter 7 of the Bankruptcy Code, scheduling only pre-marital debts and assets.

15 September 1990 First post-marital charges on Jacqueline Marusic's MasterCard. Within two months, she charged $3,014.07 on that account. Excepting a charge of $50.48 on 20 October, all charges were for less than $50.00; on several days, there are multiple charges with the same merchants. Her credit limit was $1,000.00.

19 October 1990 Seafirst closed Master-Card account.

18 December 1990 Zeljko Marusic Discharge Order entered.

19 February 1991 Jacqueline Marusic filed for relief under Chapter 7, having signed the schedules 14 January 1991.

20 May 1991 Seafirst filed the complaint commencing this action, objecting to Ms. Marusic's discharge under § 523(a)(2).

Thereafter Seafirst first learned of Zeljko Marusic's bankruptcy case in deposition of Jacqueline Marusic.

Seafirst views Ms. Marusic's use of her MasterCard September and October as a "shopping spree", and believes she had neither the means or any intention of paying for her purchases, noting that she was over her credit limit at the time. Ms. Marusic responds, in her Affidavit opposing summary judgment:

... ... I opened my Seafirst master-card account in 1988 as a single person. Zeljko never signed on the application and in fact, the account is in my prior name "Morgan."

I first contacted Mr. Schmit [her counsel] on May 30, 1990 for the purpose of having him file a bankruptcy petition for Zeljko Marusic, who was then my fiance. I had taken out a loan in early 1990 in an attempt to bring Zeljko's debts current so he could avoid bankruptcy. Zeljko was in Saudi Arabia at the time and I wanted him to be free of his credit problems before we got married. I was concerned that it might affect my credit, which was good. The filing was delayed because of Zeljko's employment in Saudi Arabia and by the time things were ready, Zeljko had come back early and we were already married. Zeljko pro-

---

**1.** 11 U.S.C.: references to "§", "Section" or to "Chapter", without more, are to the Bankruptcy Code.

ceeded with the bankruptcy petition, listing only his creditors and only his assets. It was our intent then, as always, that he would discharge only his debts. I never wanted to involve my creditors, and it was our intent at the time to pay my creditors.

Several unanticipated events occurred in the fall of 1990 that led to my unexpected bankruptcy filing. When we married, Zeljko was making very good money in Saudi Arabia. However, the war broke out and that cause Zeljko to quit his job and come home. In July I became pregnant. Prior to that time, I worked two jobs. I stopped working two jobs after I was pregnant, but continued to work full-time at Multicare. Zeljko came back for good at the end of August, 1990. At that time, he had a job lined up with the VA, but he was not going to start for a month or so. So entered October, 1990, we were down to just my income from one job for what we thought would only be a short period of time, with the holidays approaching and expecting our first child. I decided to use my credit card for our daily purchases rather than the limited cash we had at the time, thinking that when Zeljko started working at the VA, we could then have the income to make the payments to bring the account current. I knew I was going to go over my limit, but I had gone over the limit in December, 1989, and had been allowed to continue to charge on the account and make payments to bring the account within the limit. I assumed we would be able to do the same thing in October. However, Zeljko's job fell through, and instead of having his income available in October, he ended up unemployed until December. In the meantime, my hours at Multicare were reduced, which further reduced my income. It became clear in later November that we were just not going to have the income to pay our way out of debt. I contacted Mr. Schmit on November 28, 1990 to discuss filing bankruptcy.

It has been alleged that my purchases in October were unusual and that this was a "shopping spree." It was not. I did not buy luxury items. The things I bought, my family needed, i.e., food, clothing, baby items, gifts for Christmas. I purchased the same amount and types of items as I have in the past. The only difference here is that I used a charge card for the majority of our expenses rather than my checking account. As far as multiple purchases at one store on the same day, I have always done this. I am a comparison shopper, and it is not unusual to go back and forth from one store to another. Also, many stores, like JC Penney and Sears, have multiple departments were you buy individual items. Attached are account statements showing multiple purchases prior to my so-called "spree." Also attached is my checking account statement for a previous month showing similar monthly expenditures.

*Conclusion.* I had always intended on paying Seafirst Bank and all of my other creditors. If I had meant to defraud Seafirst, then why didn't I tell Zeljko to wait a month or two more on his bankruptcy and then I would join him and wipe out all of our debt at once. Why purposely limit his bankruptcy to only his creditors, incur the cost of that bankruptcy and then go through the same expense several months later? Why would I pay Seafirst $200 on August 31, 1990? This was not "creative filing" as suggested by Seafirst. This was the result of unexpected financial difficulties that made it impossible for my husband and me and our new family to pay my debts. [attachments omitted]

## II. CONTEXT: COMMUNITY PROPERTY IN WASHINGTON

As noted by Professor Cross:

Washington's present community property regime, with the major exception of the 1972 amendments, has remained largely unchanged in its basic structure since enactment by the territorial legislature in 1879. The statutes, in two separate sections, provide that property and pecuniary rights owned by each spouse

at the time of marriage, any property thereafter acquired lucratively, and the rents, issues, and profits therefrom constitute separate property. All property acquired after marriage that is not separate property is community property. Under the 1972 changes each spouse has equal management power over the community property. Each spouse has a general inter vivos power to dispose of the community personal property, but neither alone can acquire, convey, or encumber community real property, convey or encumber community household goods, or purchase or transfer community business assets in some situation. Each spouse may devise or bequeath his or her half of the community property and may deal in all respects with his or her separate property as if unmarried. [footnotes omitted] H. Cross, *The Community Property Law in Washington*, 61 Wash.L.Rev. 13, 18–19 (1986).

 Wages and other earnings during marriage are "onerously" and not "lucratively" acquired, and are community property. Debts incurred by either spouse after marriage are presumed to be community obligations. RCW 26.16.030; *Oil Heat Co. of Port Angeles v. Sweeney*, 26 Wash. App. 351, 353, 613 P.2d 169 (1980). The presumption can be overcome only by clear and convincing evidence. *Beyers v. Moore*, 45 Wash.2d 68, 272 P.2d 626 (1954). As was said by Judge Williams in *Brubaker v. Hovde*, 45 Wash.App. 44, 47, 723 P.2d 1193 (1986):

> The presumption is than an obligation incurred or an enterprise undertaken by either spouse during marriage is for the benefit of the community. *Oregon Imp. Co. v. Sagmeister*, 4 Wash. 710, 711, 30 P. 1058 (1892). That the community receives no actual benefit from a transaction is of no consequence—there need only be a potential of benefit to the community. *Way v. Lyric Theater Co.*, 79 Wash. 275, 278, 140 P. 320 (1914); *Oil Heat Co. v. Sweeney*, 26 Wn.App. 351, 355, 613 P.2d 169 (1980).

*Brubaker* held that the fact that the defendant husband signed an earnest money agreement "Robert L. Hovde as a separate estate." was insufficient to overcome the presumption of community obligation. See also, H. Cross, *op. cit.*, at 116–122.

There appear to be both a community obligation and a separate obligation at issue here: approximately $1,000 of the balance owed Seafirst is, apparently, for Ms. Marusic's charges prior to her marriage.

### III. DISCUSSION

 A. *Enforceability Against Community Property.* Debtor agrees that there are no material factual issues on this aspect of Seafirst's motion.

In essence, § 524(b) shrinks a debtor's discharge by negating the injunction found in § 524(a)(3) against post-discharge enforcement of a pre-petition community claim against community property acquired post-petition by the debtor, when:

(1) the debtor's spouse is, or within six years of the filing of debtor's petition, was, a debtor under the Bankruptcy Act or Code, and the Court does not grant that spouse a discharge; or

(2) the Court would not grant debtor's spouse a Chapter 7 discharge had that spouse commenced a case on the date debtor filed, and makes that determination within the time and in the manner provided for determining, under § 727, the debtor's right to a discharge.

Here Mr. Marusic would not be entitled to a Chapter 7 discharge had he filed on the same date Ms. Marusic did: he was discharged in his own Chapter 7 case only about two months before her filing. § 727(a)(8).

Ms. Marusic contends, however, that Congress intended to protect the community property where neither spouse has engaged in "wrongdoing", relying on Professor King, and quoting:

> ... the overriding theme of [§§ 524(a)(3)–(b) ] is that the economic sins of either spouse shall be forever visited upon the community property. In short, Congress has chosen to grant fresh-start protection for after-acquired community property when both spouses are innocent of any wrongdoing, al-

though one spouse chooses not to file a bankruptcy case. In the other situation, when a wrongdoer seeks to hide behind his or her spouse's discharge, a partial discharge for the nondebtor is denied, and after-acquired community property remains liable for the debts of the nondischarged spouse, thereby frustrating the innocent spouse's fresh start.[2]

Not surprisingly, Debtor argues that neither she nor her husband committed any "wrongdoing". Debtor's implicit premise is that § 524(b) does not take effect unless Zeljko Marusic's obligation (as a member of the marital community) to Seafirst would be nondischargeable under § 523(a). Debtor cites no cases for the propositions that the operation of § 524(b) is predicated on the non-debtor spouse's "wrongdoing", and that such "wrongdoing" requires nondischargeability as to him under § 523(a).

There is, apparently, no reported case dealing with the situation here, where the reason the debtor's spouse would not be discharged as to the community creditor is the six year bar of § 727(a)(8). There are, however, instructive § 524 cases: *In re Bernardelli*, 12 B.R. 123 (Bkrtcy.D.Nev. 1981); *In re LeSueur*, 53 B.R. 414 (Bkrtcy. D.Ariz.1985); and *Matter of Grimm*, 82 B.R. 989 (Bkrtcy.W.D.Wis.1988). In *LeSueur*, the Court held, in an adversary proceeding against both debtor spouses in a joint case, that the effect of finding nondischargeability for fraud as to debtor husband only was that the separate property of the husband and the post-petition community property of the couple were liable for the debt. The Court stated:

Thus, the Code's clear policy is that the economic sins of either spouse shall be visited upon the community when a discharge is denied. *Collier, supra,* at 524–

11. There is no reason why a different policy should follow when the spouse's offense results in an exception to discharge, rather than outright denial of discharge. A marital community whose actions do not conform to the standards imposed by law should not earn the same discharge received by joint debtors who did not engage in proscribed conduct. 53 B.R. 416.

Unfortunately for Marusics, and *Collier* notwithstanding, Congress did not distinguish between venial and mortal economic "sins" in the language of § 524(b). Rather, the operative language of § 524(b)(2)(A) is "the court would not grant the debtor's spouse a discharge in a *case under Chapter 7 ...*" [emphasis added]; there is no requirement that the creditor establish nondischargeability under § 523(a).

Since Zeljko Marusic is time-barred from obtaining a discharge, Seafirst may enforce the MasterCard obligation against Marusics' post-petition community property, including income, if it has met the time requirements of § 524(b)(2)(B).[3]

B. *Timeliness.* Section 524(b)(2)(B) provides:

a determination that the court would not so grant such discharge is made by the bankruptcy court within the time and in the manner provided for a determination under section 727 of this title of whether a debtor is granted a discharge.

Jacqueline Marusic argues that this language and Bankruptcy Rule[4] 4004 require Seafirst to have filed a complaint objecting to the discharge of Zeljko Marusic by 20 May 1991, the cutoff date for filing complaints to determine dischargeability in her case. She cites no authority. To reach the

---

2. 13 King, Ed., *Collier on Bankruptcy*, 15 ed. ¶ 524.01, at pages 524–12 and –13.

3. Alternatively, analyzing by way of Zeljko Marusic's bankruptcy: his filing, by operation of § 541(a)(2), put the marital community in bankruptcy. See, *In re Homan*, 112 B.R. 356 (9th Cir.BAP 1989). The Marusics' intention that only his debts and assets be affected in Zeljko Marusic's bankruptcy does not overcome the statute's effect. In his bankruptcy, as acknowledged in the Affidavit of Zeljko Marusic, Sea-

first was not a scheduled creditor, and it is uncontroverted that Seafirst had no knowledge of his filing before his discharge. Whatever community liability there was to Seafirst as of the date of Mr. Marusic's filing was not discharged, § 524(a)(3), and any subsequent obligation incurred by the Marusic marital community would be post-filing, unaffected by the discharge.

4. Formally cited: Fed.R.Bankr.P.

conclusion urged by Ms. Marusic, I would need to impose a forced and unnatural construction upon the quoted section: the referent of "such discharge" is unambiguously to the hypothetical discharge of Debtor's spouse in the preceding subparagraph (2)(A), while the time component refers to "debtor", rather than "debtor's spouse".

Here, Seafirst had no knowledge of Zeljko Marusic's status as its obligor's husband, or of his bankruptcy, until sometime after that date[5]. Seafirst's action was unquestionably timely with respect to Jacqueline Marusic, and what it seeks here is not precisely a determination of the dischargeability of a claim against Zeljko Marusic. Instead, the question regards the *effect* of Jacqueline Marusic's discharge, rather than Zeljko Marusic's entitlement to a discharge, with respect to Seafirst's community claim. Seafirst's request was timely.

■ C. *Dischargeability.* Distinct from the community property question is that of the dischargeability of Jacqueline Marusic's credit card debt. Seafirst did not specify any particular sub-subparagraph of § 523(a)(2) in its Complaint, but has submitted no evidence which would establish either Ms. Marusic's use of a false statement in writing regarding her financial condition or that her charges were for "luxury goods and services", eliminating sub-subparagraphs (B) and (C).

Section 523(a)(2)(A) bars the dischargeability of debts to the extent they are for credit obtained by "... false pretenses, a false representation, or actual fraud ...[.]" Courts have applied that sub-subsection to bar dischargeability where the creditor shows by clear and convincing evidence that the debtor made the charges with no intention of paying. *In re Dougherty*, 84 B.R. 653 (BAP 9th Cir.1988) articulates, and *In re Borste*, 117 B.R. 995 (Bkrtcy. W.D.Wash.1990) adopts, 12 nonexclusive factors to be considered in determining a debtor's intent. Jacqueline Marusic's Affidavit, quoted at length above, raises issues of fact respecting several, if not a majority,

of the *Dougherty* factors, precluding summary judgment.

D. *Attorney's Fees.* Seafirst has requested an award of contractual attorney's fees, based on the Cardmember Agreement signed by Jacqueline Marusic. Determining entitlement to such fees now would be premature, and Seafirst prevails here on a theory predicated on the operation of the Bankruptcy Code itself, rather than any contractual agreement.

## IV. ORDER

Seafirst's Motion for Summary Judgment is GRANTED IN PART: the Marusic marital community remains liable for the community obligation. Seafirst has not established Jacqueline Marusic's separate obligation to it is nondischargeable as a matter of law, nor the exact amounts of the separate and community obligations; those portions of its motion are DENIED. The request for attorney's fees is DENIED without prejudice.

---

5. The date of Seafirst's deposition of Jacqueline Marusic is unstated in the pleadings; she has not alleged Seafirst knew of her husband's bankruptcy prior to 20 May 1991.